In re Ramon HERNANDEZ and wife, Carrie L. Hernandez, Debtors.

SEARS, ROEBUCK AND CO., Plaintiff,

v.

Ramon HERNANDEZ, and wife, Carrie L. Hernandez, Defendants.

Bankruptcy No. 95–31969.
Adversary No. 96–3018.

United States Bankruptcy Court,
W.D. Texas,
El Paso Division.

April 11, 1997.

874

Dan G. Young, McCleskey, Harriger, Brazill & Graf, L.L.P., Lubbock, TX, for Plaintiff.

Edgar J. Borrego, Office of Jerry Tanzy, El Paso, TX, for Defendants.

### Decision on Complaint to Determine Dischargeability

LEIF M. CLARK, Bankruptcy Judge.

CAME ON a complaint by Plaintiff, Sears, Roebuck, & Company, to find certain debts incurred by debtors, Ramon & Carrie Hernandez, excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(C). For the reasons set forth below, the court finds that the plaintiff's claim for nondischargeability under § 523(a)(2)(A) (*i.e.*, that the debt was obtained by false pretenses, a false representation, or actual fraud) should be denied, because the plaintiff (Sears) has failed

to establish certain necessary elements. On the second dischargeability claim, however, the court finds that the creditor has made the necessary showing to establish that the goods were "luxury goods" purchased within 90 days of bankruptcy, raising a presumption of nondischargeability under § 523(a)(2)(C). Because the debtor has not rebutted this presumption, the court concludes that the debt for these purchases is nondischargeable under § 523(a)(2)(C).

### Facts

The facts of this case, such as they are, are undisputed. On November 1, 1995, a Sears representative solicited one of the co-debtors in this case, Carrie Hernandez, to sign up for a Sears credit card.[1] Ms. Hernandez provided the Sears representative with certain financial information and agreed to abide by the terms of the credit card agreement and, in return, was granted immediate use of a Sears credit card. That same day she charged $3,000 worth of merchandise on her new card. The very next day, she—and maybe her co-debtor husband—went to a previously scheduled meeting with a bankruptcy attorney.

For 26 days following the meeting with the bankruptcy attorney, the debtors continued to use their Sears card; although they returned many of the original November 1 purchases, they also purchased a host of new items. By November 28, the debtors had accumulated $3,876.54 in charges. On December 27, 1995, the debtors filed for bankruptcy under chapter 7 of the Bankruptcy Code. Soon after, Sears challenged the debtors' right to discharge their Sears credit card debt.

### Analysis

A. SECTION 523(A)(2)(A)

Sears cites to two provisions of the Bankruptcy Code to support their contention that the credit card debt should not be discharged. The first provision, § 523(a)(2)(A),

---

**1.** It appears that this solicitation occurred in a Sears store in El Paso.

provides that a discharge will not be granted for any debt

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A).

■ In general, that provision contemplates fraud by the debtor involving "moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir.1995) (quoting COLLIER ON BANKRUPTCY ¶ 523.08[4] at 523–50, Lawrence P. King et al. eds., 15th ed. *1989); Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir.1992) (same). Like other exceptions to discharge, the provisions of § 523(a)(2)(A) warrant narrow construction. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915); *Allstate Ins. Co. v. Foreman (In re Foreman)*, 906 F.2d 123, 126 (5th Cir.1990), and the creditor bears the burden of proof in such actions. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). Deference, however, must be paid to the policy that the Bankruptcy Code is not to afford a fresh start to any and every debtor, but only to "the honest but unfortunate debtor." *Id.* at 286–87, 111 S.Ct. at 659–60.

■ To define the necessary elements of a § 523(a)(2)(A) action, the Fifth Circuit has distinguished between actual fraud on the one hand and false pretenses and representations on the *other. RecoverEdge* at 1292. "In order for a debtor's representations to be a false representation or false pretense under § 523(a)(2), it 'must have been: (1)[a] knowing and fraudulent falsehood [ ], (2) describing past or current facts, (3) that [was] relied upon by the other party.'" *Id.* at 1292–93 (changes in original) (quoting *In re Allison*, 960 F.2d at 483). Actual fraud, in contrast, requires the creditor to prove that: "(1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representation; and (5) that the creditor sustained losses as a proximate result of the representations." Id. at 1293 (footnote omitted) (quoting *Keeling v. Roeder (In re Roeder)*, 61 B.R. 179, 181 (Bankr. W.D.Ky.1986)); *Federal Deposit Ins. Corp. v. Smith (In re Smith)*, 133 B.R. 800, 805 (N.D.Tex.1991).

■ Neither the creditor nor the debtors in the instant proceeding suggest which of the categories is at issue here, *i.e.*, are the debtors alleged to have committed "actual fraud" or are the debtors alleged to have made a "false representation or false pretense." We need not choose, however, because both categories contain a reliance element; an element which requires the creditor to demonstrate reliance on a debtor representation.[2] Accordingly, this court need only determine the correct level of reli-

---

**2.** Although the necessity of reliance appears to be undisputed by the parties, *Field v. Mans*, —— U.S. ——, 116 S.Ct. 437, provides additional support for the proposition that *all* § 523(a)(2)(A) creditor claims must demonstrate some minimal level of reliance. In that case, the Court found that reliance was not only inherent in the common law claims listed in § 523(a)(2)(A)—misrepresentation, false pretenses and actual fraud—it was also required to "some degree ... to satisfy the element of causation inherent in the phrase 'obtained by.'" *Id.* at ——, 116 S.Ct. at 442.

"Obtained by" is located in § 523(a)(2) and thus must be shown for each of the (a)(2)(A) common law claims. *See* 11 U.S.C. § 523(a)(2)(A) ("for money, property, services, or an extension, renewal, or refinancing of credit, to the extent *obtained by*—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."). Thus, even without the actual fraud claim (that claim examined by the Supreme Court in *Field)*, it appears that all (a)(2)(A) claimants must independently demonstrate that "money, property, services, or an extension of credit" is provided by the creditor because of the language in (a)(2).

ance mandated in the present matter.[3] The debtors argue that the recent Supreme Court decision of *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), provides us with the appropriate yardstick.

In *Field,* the Supreme Court turned to acquired common-law meanings to determine the requirements for actual fraud. Concluding that neither "actual reliance" nor "reasonable reliance" was the appropriate standard in that case, it adopted a standard which required the creditor to demonstrate a burden that fell somewhere between the two. The standard was termed "justifiable reliance." It was defined as allowing a plaintiff to rely upon a representation of fact that investigation might have revealed the falsity of, but required the plaintiff to also "use his senses. [A plaintiff] cannot recover if he blindly relies on a representation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field v. Mans,* —— U.S. at ——, 116 S.Ct. at 444. Although Sears does not appear to challenge the applicability of *Field* to the present proceeding, we are less certain.

The Supreme Court limited the applicability of that holding to § 523(a)(2)(A) actual fraud claims. *Field v. Mans,* —— U.S. at ——, 116 S.Ct. at 443. Accordingly, if we were to apply the "justifiable reliance" test, we would be ignoring the fact that the credi-

tor has not delineated which claim he is bringing. For instance, the creditor may only need to demonstrate actual reliance if their claim is based on false pretenses or false representations.[4] Because the reliance standards are on a continuum, however, and the creditor has failed to demonstrate even the lowest reliance threshold, there is no need to make an exact determination as to which reliance standard is applicable to the instant proceeding.

A party required to demonstrate a specific level of reliance must *at least* demonstrate actual reliance. For example, the *Field* court would not even reach the question of whether the creditor's reliance was "justifiable" had the creditor not relied at all. Similarly, if the standard is reasonable reliance, we could not determine whether the creditor had acted reasonably in relying on the debtor's representations had the creditor failed to examine any of the representations. Thus, the *sine qua non* of all reliance claims is reliance in fact.

Bare reliance has recently been defined by District Judge Sidney Fitzwater as, "a causation-type element in a fraud claim. If a party does not rely on a fraudulent representation, the representation cannot be said to have produced an injury to be remedied." *Federal Deposit Insurance Corp. v. Smith (In re Smith),* 133 B.R. 800, 806 (N.D.Tex. 1991)[5]; *see also* BLACK's LAW DICTIO-

---

**3.** We do not provide a detailed examination of the other elements of § 523(a)(2)(A) for several reasons. First and foremost, the parties in this case have focused almost exclusively on the reliance issue. Second, a finding of no reliance in the § 523(a)(2)(A) dispute is dispositive.

**4.** The Supreme Court stated in *Field,* "Although we do not mean to suggest that the requisite level of reliance would differ if there should be a case of *false pretense or representation* but not of *fraud,* there is no need to settle that here." *Field v. Mans,* —— U.S. at —— n. 8, 116 S.Ct. at 443 n. 8.

In spite of that caveat, other courts have concluded, without explanation, that Field stands for the proposition that justifiable reliance is an element of *all* actions brought under § 523(a)(2)(A). *See, e.g., AT&T Universal Card Servs. v. Alvi (In re Alvi),* decide the issue, we are inclined to agree, but with explanation. The source from which the Supreme Court distilled its actual fraud re-

quirements-the Restatement (Second of Torts)-only defined "misrepresentation," not "actual fraud." In point of fact, the Restatement does not appear to differentiate between false pretenses, misrepresentations, and actual fraud at all. Rather, one type of tortious act (misrepresentation) appears to have usurped the applicability of the other two. It is probably correct to assume, therefore, that the level of reliance required for all three types of fraudulent behavior is "justifiable."

**5.** This definition appears to closely comport with that imagined by the Fifth Circuit. For example, in *Allison v. Roberts (In re Allison),* 960 F.2d 481 (5th. Cir.1992), the court provided the following examination of actual reliance.

Roberts, in signing the deeds conveying her property, in fact relied on Dean Allison's representation that the first mortgage would not exceed 20% of the purchase price, thus leaving

NARY at 1160 (5th ed.1979) (defining reliance as a "belief which motivates an act").

The evidence presented at the trial in this case proves that the debtor filled out some kind of credit application; that this information was forwarded to Sears' central credit application bureau; and, that a card was issued to the debtor. From this, we cannot determine whether any of the application information was even looked at, let alone relied on, by Sears personnel.[6]

■ In sum, while the required level of reliance may vary depending on the facts and circumstances of a particular § 523(a)(2)(A) case, *see Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351, the element always must be proven by some evidence. *See AT&T Universal Card Services v. Richards (In re Richards),* 196 B.R. 481, 482 (Bankr. E.D.Ark.1996). Passively extending credit in itself is not reliance. *See Bank One Columbus, N.A. v. McDaniel (In re McDaniel),* 202 B.R. 74, 78 (Bankr.N.D.Tex.1996) ("A creditor cannot sit back and do nothing and still meet the standard for *actual* and justifiable reliance."). Moreover, creditors are not free to ignore their burden in relation to this element of the cause of action, *see Id; In re Alvi,* 191 B.R. 724, 731 (Bankr.N.D.Ill.1996); *see also First Nat. Bank v. Robinson (In re Robinson),* 55 B.R. 839, 847–48 (Bankr. S.D.Ind.1985), nor can the court assume that a creditor relied on any alleged representation. *In re Alvi,* 191 B.R. at 731. To find otherwise, we would impermissibly shift the burden of establishing nondischargeability from the creditor to the debtor. *See Grogan v. Garner,* 498 U.S. at 287, 111 S.Ct. at 659. This court will not adopt such an approach.

■ Perhaps in recognition that reliance has never been demonstrated, Sears argues that we should adopt the "implied representation theory." This theory suggests that a credit card holder represents on each use of a credit card that he has the ability and intention to pay for the charges. *See Chevy Chase Bank v. Briese (In re Briese),* 196 B.R. 440, 445 (Bankr.W.D.Wis.1996); *FCC Nat. Bank v. Branch (In re Branch),* 158 B.R. 475, 477 (Bankr.W.D.Mo.1993). From this, we are also to infer that the reliance element has been satisfied. We find the argument to be without merit.

The creditor points primarily to the case of *First Deposit Credit Services Corp. v. Preece (In re Preece),* 125 B.R. 474 (Bankr.W.D.Tex. 1991), to support their position. That court found that a debtor made an implied representation that he had both the ability and intent to repay on each use of a credit card. It was necessary to infer such a representation, concluded the court, because a credit card issuer and borrower have no face to face transactions.[7] Accordingly, it would be unrealistic to require an overt expression on the part of the purchaser to both the seller and the credit card company that he is not insolvent and intends to pay for the purchase at the time of the credit transaction. *Id.* at 477 (citing *Ranier Bank v. Poteet (In re Poteet),* 12 B.R. 565, 568 (Bankr.N.D.Tex.1981)).

---

Roberts adequately secured on the 80% credit portion of the purchase price. After hearing the testimony of those present at the closing of the sales, the bankruptcy court found that Roberts' attorney refused to proceed with the closing without a limitation on the first mortgages as agreed to in the contract to sell, the initial agreement on the transactions. That assurance was forthcoming from Dean Allison. Roberts relied on that assurance in signing the deeds conveying here property on a credit basis. The requisite reliance for section 523(a)(2)(A) purposes exists. *Id.* at 485.

**6.** We cannot imagine that Sears would extend several thousand dollars in credit without first reviewing the debtors' application and performing a credit check. As noted, however, Sears has not provided evidence that it did either. If this is a tacit oversight because: (1) Sears was testing new judicial waters; and/or (2) a more detailed exploration of the issue was not warranted by the return gained by winning this battle, we hope this opinion provides some guidance for creditors who bring future § 523(a)(2)(A) actions in this court.

**7.** Thus, in a normal credit card transaction, the cardholder cannot be said to have directly represented anything to the card issuer without an implied representation. *See Chase Manhattan Bank v. Murphy (In re Murphy),* 190 B.R. 327, 331 (Bankr.N.D.Ill.1995); *Chase Manhattan Bank v. Ford (In re Ford),* 186 B.R. 312, 317 (Bankr.N.D.Ga.1995).

We begin by noting that the facts which motivated the decision in *Preece* are not the facts of our case. *Preece* and other courts have adverted to the relatively recent phenomenon of third party credit transactions and the uniqueness of the credit relationship thus created to justify their promulgation of the implied representation theory. Our case involves a standard relationship two party credit transaction between a merchant and a customer (a "face to face" transaction).[8] Thus, there is no need to imply a direct relationship when one already exists.[9]

More importantly, the foundations of the implied representation theory are subject to serious criticism. We wonder, for instance, why one should infer a *fictional* ability and intent to repay, and supply by presumption the concomitant finding that the credit card company relies on the debtor's "fictional" promise, when the creditor's *actual* reliance takes place at the account's creation.[10] It is at that point in time that financial information is generally requested and credit reports are generally obtained. As Judge Queenan aptly observed in *In re Cox*, "[a] party extending credit under a contract relies upon the other's express promise to pay contained in the contract, not a later implied representation of intent to pay flowing from performance." *G.M. Card v. Cox (In re Cox)*, 182 B.R. 626, 636 (Bankr.D.Mass.1995).[11] With the credit card company already in possession of an express promise in the form of a cardholder agreement, "it would be irrational for a fact finder to conclude [that the creditor] relied upon a later implied representation of intent to pay emanating from use of the card. Use of the card did not create a separate contract. The debtor was merely exercising his rights under the parties' [original] contract." *Id.*[12] An inference of ability to repay would certainly be helpful to Sears in this case—especially in light of the fact that they failed to demonstrate any form of actual reliance on the express contract—[13] but it as inference that cannot and should not be made. We reject Sears' proffered implied representation theory as a substitute for proof of reliance as without merit.[14]

Although we have focused almost exclusively on the reliance element to this point—

**8.** This two-party relationship is no recent phenomena, Sears has had credit relationships with customers for at least one hundred years.

**9.** The notion that one must imply representations for third party credit card transactions because of their modem origins is simply not based in fact. The predecessor of VISA was formed in 1957, JOSEPH NOCERA, A PIECE OF THE ACTION 23–24 (1994), and credit cards were widely used prior to the enactment of the Bankruptcy Code in 1978.

**10.** It is interesting to note that the case relied on by the creditor in support of their position, *In re Preece*, 125 B.R. 474, did not have to infer the reliance element. There the court noted that the debtor applied for a card via an application; the creditor reviewed that application and pulled credit reports on the debtor; then the creditor called the debtor to verify the information they had gathered. Only then did the creditor extend a $5,000.00 line of credit. *Id.* at 475.

**11.** It appears that a subsequent decision by Judge Queenan which relied on the holding of *In re Cox* was reversed and remanded by the district court on appeal. *See* 30 BANKR. CT. DEC. WEEKLY NEWS & COMMENTS 1 (March 25, 1997) (discussing *In re Liet Van Nguyen*). This decision is not yet available on-line or via a publishing service.

**12.** In fact, adopting the implied representation theory in this case would create an absurd situation that even Judge Queenan could not have imagined. We would infer that the debtors had the ability and intent to repay at the time of sale *and that the creditor relied on that inferred promise* even though we have an express contract that was signed by one of the debtors *within hours* of the bulk of the purchases.

**13.** *See supra* footnote 6.

**14.** Although not suggested by either of the parties, another strand of the implied representation theory cases have found that the presumption allows a creditor to rely on past acts of the debtor, to wit, continued payment of their monthly credit card bills, as justification for continued credit extensions or even credit line increases. Thus, by using the implied representation theory, credit card extenders can meet the § 523(a)(2)(A) justifiable reliance requirement by presenting evidence of a strong past creditor-debtor relationship. *Citibank, N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082 (9th Cir.1996).

This strand of the theory appears to be more logical than Preece, *see* text, but even if it were adopted, it doesn't help the creditor here. If we assumed that the Hernandezs represented to Sears that they had the ability and intent to pay for each item *at the time of that item's purchase*, Sears still has not shown that it was justified in

again, because this was the focus of the parties in this case—we would be remiss if we did not point out several "non-reliance" problems with the implied representation theory. For instance, the debtor is supposed to have impliedly represented an intent *and ability* to repay with each use of the card, so what could the debtor's representation be other than a statement of financial condition? Section 523(a)(2)(A), however, excludes "*statement[s] respecting the debtor's or an insider's financial condition,*" 11 U.S.C. § 523(a)(2)(A), from the ambit of that provision. *See In re Cox,* 182 B.R. at 629. The more applicable statute, § 523(a)(2)(B), requires any actionable statement of financial condition to be *in writing.* 11 U.S.C. § 523(a)(2)(B). Thus, it seems clear from the statute that a debtor's *implied* representation of ability to pay is a "statement respecting the debtor's financial condition" which falls well outside the statute's coverage.[15]

In all events, even if a court could ignore the express exclusion of unwritten statements of financial condition from the ambit of § 523(a)(2)(A), we fail to see why anyone should (or would) imply a current ability to pay at the time a charge is made. One of the primary reasons people use credit cards, after all, is a present *lack* of ability to repay— hence the name, *credit* cards. *See Chase Manhattan Bank v. Murphy (In re Murphy),* 190 B.R. 327, 332 (Bankr.N.D.Ill.1995); *Chase Manhattan Bank v. Carpenter (In re Carpenter),* 53 B.R. 724, 728 (Bankr.N.D.Ga. 1985).

relying on that implied representation. Unlike the numerous other cases in which this strand of the implied representation theory is invoked, there was no continued creditor-debtor relationship that Sears can point to as evidence of their reasonableness in extending the current line of credit; the debtor in this case went into bankruptcy almost immediately after obtaining the Sears credit card. In fact, the only evidence that could support Sears' claim that the extension of credit was justified in this case is the credit application itself. But, of course, that returns us to the same problem we saw before; Sears has never provided evidence that they even looked at the application in the first place. *See* text *supra.* Thus, this strand of the implied representation theory is also no help to Sears.

More importantly, *the* primary reason creditors want customers to use their credit card is that very inability of their customers to timely repay their credit card debt; credit card companies seek customers who will charge more than they can afford on a month-to-month basis but who will eventually pay back their bills. *See* NOCERA, at 34 (quoting the philosophy of a very successful recent entrant into the credit card market, through one of the company's employees, "[First, you] get people to borrow a lot of money. This is the most important thing. Secondly, you identify people who are likely not to become delinquent. And thirdly, you make it easy for them to get into debt"); Albert B. Crenshaw, *Ending a Free Ride; Credit Card Firm Plans Fee if Balance is Paid Monthly,* WASHINGTON POST, Sept. 11, 1996 (noting that one large credit company, G.E. Capital, makes $318 a year on the typical consumer who carries a balance while so-called freeloaders (those who pay their balance monthly) cost the company $30 a year; therefore, the company instigated an annual fee to those customers who pay their balances on a timely basis).[16] Credit issuers are willing to risk nonpayment because the profits on finance charges exceed their risks. Thus, the same industry that seeks customers who will spend more than their means requests that discharge be denied to these customers because of an implied promise (which courts must infer) not to spend more than their means. Judge Kahn aptly described the situation in which this court is now placed: "[the] Plaintiff would have [us] 'bootstrap' the fact that Defendant–Debtor

**15.** We fail to see how courts can imply an actionable representation of ability to pay, *see, e.g., Branch,* 158 B.R. at 478, *Household Card Services/Visa v. Vermillion (In re Vermillion),* 136 B.R. 225, 227 (Bankr.W.D.Mo.1992), when § 523(a)(2)(A) expressly excludes such implications.

**16.** Incredibly, these customers who roll their balances ("optimal" customers for credit card companies) make up approximately 64% of all credit card users. Kerry Capell, *Dunned if You Do, Dunned if You Don't,* BUSINESS WEEK, September 23, 1996.

was having financial difficulty into an intent to defraud Plaintiff. This is what is wrong with the 'implied representation' analysis; intent to defraud is too easily implied from the fact a debtor was having financial problems." *In re Carpenter*, 53 B.R. at 729.

More to the point, adoption of this theory also improperly shifts the burden of proof in § 523(a)(2)(A) actions, *see* FED.R.BANKR. PROC. 4005; *ITT Financial Services v. Hulbert (In re Hulbert)*, 150 B.R. 169, 175 (Bankr.S.D.Tex.1993); *see also Grogan v. Garner*, 498 U.S. at 287, 111 S.Ct. at 659, renders nugatory the principle that exceptions to discharge are to be construed strictly against the objecting creditor and liberally in favor of the debtor, *see Allstate Ins. Co. v. Foreman (In re Foreman)*, 906 F.2d 123, 126 (5th Cir.1990); *In re Hulbert*, 150 B.R. at 175, and leads to the creation of an incredible irony; an ability to repay is inferred to protect an industry that purposefully solicits customers who generally lack such ability. It is not the job of any court, however, to *infer* added protection for the benefit of one industry. To the extent the credit card industry seeks additional protection, they should continue to raise their concerns in the halls of Congress.

The implied representation theory, in sum, will not stand up to scrutiny. We reject it as without merit. Thus, the creditor was required to demonstrate by affirmative proof the reliance element of its § 523(a)(2)(A) action. Having failed to do so, *see supra*, the creditor's cause of action under § 523(a)(2)(A) itself fails.

## B. SECTION 523(a)(2)(C)

▮ The second exception to discharge provision cited by Sears, § 523(a)(2)(C), provides that a debt will not be discharged if the debt is for "consumer debts owed to a single creditor and aggregating more than $1,000 for 'luxury goods or services,'" incurred within a specified period before the debtor declares bankruptcy.

Congress created this subsection in an effort to deter the particular practice of debt-

ors' purchasing numerous unnecessary items on credit on the eve of bankruptcy with the knowledge that the debt incurred purchasing the items would be discharged in bankruptcy. The legislative history refers to this practice as "loading up":

> Section 523 is amended and expanded to address a type of unconscionable or fraudulent debtor conduct not heretofore considered by the code—that of loading up. In many instances, a debtor will go on a credit buying spree in contemplation of bankruptcy. The new subsection (d) creates a rebuttable presumption that any debt incurred by the debtor within 40 days before the filing of the petition has been incurred under the circumstances that would make the debt nondischargeable. Only that portion of a debt which was incurred within the 40–day time period is subject to this presumption. The burden is upon the debtor to demonstrate that the debt was not incurred in contemplation of discharge in bankruptcy and thus a fraudulent debt. As the language makes clear, debts incurred for expenses reasonably necessary for support of the debtor and the debtor's dependents are not covered by the presumption.

S. REP. No.98–65, 98th Cong, 1st Sess. 58 (1985); Senate Report Accompanying § 445, Omnibus Bankruptcy Improvements Act of 1983; *see also Norwest Financial Consumer Discount Co. v. Koch (In re Koch)*, 83 B.R. 898, 901 (Bankr.E.D.Pa.1988). In 1994, the presumptive "look-back" period was extended from 40 days to 60 days. *See* H.R. REP. No. 103–834, 103rd Cong., 2nd Sess 40 (Oct 4, 1994); 140 Cong. Rec. H10770 (Oct. 4, 1994).

▮ The statute does not define "luxury goods and services;" instead it defines what they are not: " 'luxury goods and services' do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor." 11 U.S.C. § 523(a)(2)(C). The legislative history provides little further illumination: "[a]s the language makes clear, debts incurred for expenses reasonably necessary

for support of the debtor and the debtor's dependents are not covered by the presumption." S.REP. No. 98–65, 98th Cong., 1st Sess 58 (1985); Senate Report Accompanying § 445, Omnibus Bankruptcy Improvements Act of 1983.[17]

Although neither party has addressed this issue in any great detail, debtors' counsel seems to suggest that, by returning certain exercise equipment, the debtors were left only with debts for "goods reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor," in effect suggesting that only the exercise equipment qualifies as luxury goods. The obverse of this argument is that the debtor wants the court to find that, as a matter of law, such items as drapes, curtains, rugs, basketballs, speakerphones, jewelry, toasters, and lawn mowers are not "luxury goods" but are instead items for support or maintenance. We are left to wonder what inherent characteristics make these latter items "reasonable necessary for the support of the debtor and the debtor's dependents," and the debtors offer no assistance.

In the absence of more detailed legislative guidance, opinions dealing with the term "luxury" as used in this statute have "considered whether under circumstances of each particular case the purchases or transactions were 'extravagant,' 'indulgent,' or 'nonessential.'" *Carroll & Sain v. Vernon (In re Vernon)*, 192 B.R. 165, 170 (Bankr. N.D.Ill.1996); *see also General Motors Acceptance Corporation v. McDonald (In re McDonald)*, 129 B.R. 279 (Bankr.M.D.Fla. 1991); *Sears Roebuck & Company v. Faulk (In re Faulk)*, 69 B.R. 743 (Bankr.N.D.Ind. 1986). An item, therefore, need not be purchased on Fifth Avenue to be considered a "luxury." Rather, factfinders are to examine the circumstances surrounding the purchase or transaction to determine whether the transactions should be classified as a "luxury" in a given case. *In re Vernon*, 192 B.R. at 170; *In re McDonald*, 129 B.R. at 283; *In re Faulk*, 69 B.R. at 751.

Here, the debtors effectively refurbished their home at a time when they knew bankruptcy was imminent. The purchases

**17.** Although the debtor has not raised the issue, we proactively note that the reliance element inherent in the general predicate phrase "obtained by" in § 523(a)(2) ("for money, property, services or an extension of credit, to the extent *obtained by-*"), *see supra* note 2 and accompanying text, is not actually relevant in the context of subsection (a)(2)(C).

True enough, the location of the "obtained by" phrase in § 523(a)(2) would ordinarily require us to read it as applying to each of the subsections that follow, but principles of statutory construction also require courts to examine the design and language of the statute as a whole in order to divine the plain meaning and intent of Congress. *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991). Subsection (a)(2)(C), while placed under the general rubric of section (a)(2), is actually a narrow *exception* to the normal requirements for (a)(2) nondischargeability. Section (a)(2) in general describes one category of nondischargeable debts—those arising essentially from fraud. The first subsection describes debts whereby something was obtained from the creditor by means of fraud or fraudulent misrepresentation (essentially incorporating by reference the elements of common law fraud), while the second focuses on debts incurred by use of a statement in writing used to induce reliance. With regard to both of these causes of action, the creditor has the bur-

den of proof with regard to each element in order to obtain a determination of nondischargeability, including the element of reliance.

The newly added third action in subsection (a)(2)(C) is denominated as a subset of the first category, but is unique in that these actions are *presumed* to be nondischargeable. With such a presumption in place, the predicate language in subsection (a)(2) ("obtained by") does not sensibly apply to subsection (a)(2)(C). Rather, the statutory structure of § 523(a)(2)(C) suggests an effort on the part of Congress to ensure the creation of a free-standing set of criteria intended to operate independent of the normal (a)(2) requirements. The presumption of nondischargeability, plus the inclusion of the terms "incurred by" and "obtained by" within (a)(2)(C) itself confirm this intention. Had Congress wanted (a)(2)(C) to be controlled by the general "obtained by" predicate in (a)(2), both the presumption and these phrases would have been superfluous. *See Bowsher v. Merck & Co.*, 460 U.S. 824, 833, 103 S.Ct. 1587, 1593, 75 L.Ed.2d 580 (1983) (a general principle of statutory construction requires that, to extent possible, every word of statute should be given effect). Thus, the question of "reliance" does not arise in a subsection (a)(2)(C) action (except perhaps as a defensive issue on the part of the debtor to rebut the presumption).

themselves appear to satisfy no purpose other than beautifying the debtors' home and satisfying the debtors' desire to use more modern items of convenience; our familiarity with the items—*e.g.*, new rugs, phones, and draperies—makes them no less "luxurious" under the statute. Accordingly, we find that these purchases are not reasonable acquisitions for the support of the debtor and their family. *See* 11 U.S.C. § 523(a)(2)(C).

Moreover, we find that the purchases were made in the exact manner that Congress designed § 523(a)(2)(C) to proscribe; the debtor in this case started purchasing items on the day before they were to have a previously scheduled meeting with a bankruptcy attorney. Thus, the debtors "loaded up" on goods immediately prior to filing bankruptcy. *See* S. REP. No. 98–65, 98th Cong., 1st Sess 58 (1985); Senate Report Accompanying § 445, Omnibus Bankruptcy Improvements Act of 1983.

By timing the purchases so close to bankruptcy and purchasing items that were not "reasonably acquired for the support and maintenance of the debtor or a dependent of the debtor," we find that the Sears purchases have become "luxury goods" under § 523(a)(2)(C). A presumption is therefore created that the debtor has fraudulent intent under § 523(a)(2)(A). 11 U.S.C. § 523(a)(2)(C). While that presumption is rebuttable, *see, e.g., In re Vernon*, 192 B.R. at 171 (Bankr.N.D.Ill.1996); *FCC National Bank v. Orecchio (In re Orecchio)*, 109 B.R. 285, 289–90 (Bankr.S.D.Ohio 1989); *J.C. Penney Co. v. Leaird (In re Leaird)*, 106 B.R. 177, 180 (Bankr.W.D.Wis.1989); *In re Koch*, 83 B.R. at 902–03; *J.C. Penney v. Herran (In re Herran)*, 66 B.R. 323, 325 (S.D.Fla. 1986), the debtor in this case has not provided us with any evidence to overcome that presumption. The creditor is therefore granted the relief sought under § 523(a)(2)(C) denying discharge to the debtors for the debts owed on their Sears credit card.

### Conclusion

Pursuant to the foregoing, the court finds that the creditor has not demonstrated the necessary elements for their first claim, a nondischargeability action under 11 U.S.C. § 523(a)(2)(A). The court does find, however, that the creditor has demonstrated the necessary elements for their second claim, a nondischargeability action under 11 U.S.C. § 523(a)(2)(C). Accordingly, the debt owed to Sears by Ramon and Carrie Hernandez in the amount of $3,876.54 will not be discharged upon confirmation of this case. A form of judgment consistent with this decision shall be entered on even date.