In re Lawrence J. LACROSSE and Donna J. Lacrosse, Debtors.

United States Trustee, Movant,

v.

Lawrence J. Lacrosse and Donna J. Lacrosse, Respondents.

No. 1–99–00118.

United States Bankruptcy Court, M.D. Pennsylvania, Harrisburg Division.

Sept. 15, 1999.

---

584

James M. Bach, Mechanicsburg, PA, for Debtor.

Greg Lyons, Harrisburg, PA, for U.S. Trustee.

## MEMORANDUM

ROBERT J. WOODSIDE, Chief Judge.

### Procedural History

On January 11, 1999, Lawrence J. Lacrosse ("Lacrosse") and Donna J. Lacrosse ("Mrs. Lacrosse") ( sometimes, collectively, "Debtors") filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code. Within the time frame allotted, the United States Trustee ("Trustee") filed a Motion to Dismiss pursuant to 11 U.S.C. § 707(a) and (b). These sections, respectively, allow dismissal of a case for "cause" or "substantial abuse". Debtors answered, a hearing was held, and the matter is now ready for decision. I have jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

### Factual Findings

For approximately twenty-two years pre-petition, Lacrosse was employed by the Commonwealth of Pennsylvania, Department of the Treasury. He lists his current title as "Chief Taxing Officer". His current duties are to supervise operations for auditing individual tax returns.

His gross salary for each of the three years pre-petition was approximately $60,000.00. As of the date of the Petition, his net monthly salary was $4,228.00.

Lacrosse also operated a tax preparation service, which grossed approximately $20,000.00 per year but, according to his tax returns, netted only about $5,000.00 per year. His Schedule "I" shows $1,000.00 net monthly income from this service, but this figure substantially deviates from that on his tax return.

Mrs. Lacrosse was not employed outside the home during any relevant pre-petition period.

In 1992, Debtors purchased real estate and built a home at an aggregate cost of $252,000.00. Lacrosse borrowed $15,000.00 from a client of his tax preparation business in order to artificially inflate his savings account balance when he applied for his mortgage.

By 1993, Debtors' monthly mortgage payment was $1,929.00 and they had car payments totaling $594.00 per month. In that year, Lacrosse's net monthly salary was only $2,565.00.

Beginning in 1993 and in each ensuing year, Debtors' house payments and car payments alone absorbed most, if not all, of their monthly income.

Beginning in 1993 and in each ensuing year, Debtors did not have the ability to service their credit card obligations from their net income. As of the date of the Petition, Debtors had accumulated fifty-eight (58) credit cards, on which they had amassed over $500,000.00 of consumer debt.[1]

In 1992, Lacrosse began to solicit and receive substantial amounts of money from clients of his tax preparation service.

He enticed clients to give him these funds by falsely informing them that he intended to make tax-free investments, which would return to them interest rates ranging from nine to ten percent.

1. I feel compelled to note that in my seventeen years on the bench, I can recall no debtors who had managed to accumulate anything near this amount of credit card debt.

To my recollection, the most aggregate credit card debt, in any prior case brought to issue before me, was approximately $185,000.00.

As consideration for these funds, he provided a personal promissory note, payable in full on a specified date. These notes made no representations about the purposes for which the funds were to be used.

At the hearing, Lacrosse denied that he had promised tax free investments to his clients. He stated that the funds were given to him as personal loans backed only by his good credit. Lacrosse's denials and statements to this effect are not credible.

Lacrosse did not inform his clients of the fact that he already had several hundred thousand dollars of secured and unsecured obligations when he gave them his notes.

Lacrosse did not inform his clients that he would be using their money to service his ever-growing credit card debt.

Between 1992 and 1998, Lacrosse received approximately $485,000.00 from his clients.

Lacrosse delayed repayment to some clients by inducing them to allow their note to be "rolled over" into another note on the date of maturity, on their assumption that the promised rate of tax-free return had been secured, and that both the interest and principal would be re-invested.

Between 1996 and 1998, Lacrosse paid back to his clients a total of $132,500.00 of principal debt, leaving a remaining principal balance of $353,331.00. To some clients, he returned the promised interest payments, but did not provide them with a Tax Form 1099. Lacrosse cannot explain why he did not provide a 1099.

In 1996, in order to fund the repayment of one client, Lacrosse took out a second mortgage on his home.

Lacrosse asserts that he fully intended to repay each client at the time he gave them his notes. He alleged that he had "substantial" lines of credit available to him with which to repay the notes, that he was anticipating a salary increase of some $20,000.00 per year, that he had a large amount of receivables in his tax preparation business, and that his wife's return to work as a registered nurse would generate a substantial increase in household income.

Lacrosse has never received the anticipated salary increase.

Lacrosse has never deducted from his personal income taxes the alleged bad debt from his tax preparation business.

Mrs. Lacrosse has never returned to work.

When Lacrosse applied for his first mortgage, he did not disclose to the lender that he owed some $170,000.00 to his clients.

When Lacrosse applied for his second mortgage, he did not disclose to the lender that he owed some $300,000.00 to his clients.

As of the date of the Petition, Debtors had over $531,000.00 of debt to credit card issuers.

At the time they filed their Petition, Debtors were leasing two vehicles, a 1997 Cadillac and a 1996 Jeep Grand Cherokee. Their combined monthly payment was $1,301.00.

During the seven years between 1992 and 1998, inclusive, the Debtors deposited over $1 million, excluding Lacrosse's salary, into their bank account.[2]

2. Neither party has ever conclusively demonstrated what the Debtors actually did with this much money. Lacrosse asserted in testimony that all funds went to service pre-existing debt and to pay for necessities. This testimony is difficult to believe when the Debtors' schedule of assets lists few items ostensibly beyond their means other than their home and their vehicles. Lacrosse also testified that his history of credit card debt dated to the early 1970's. His implication was that he was even then making purchases beyond his means and accruing debt that was compiling interest on interest. Again, it is difficult to take him at his word and the record lacks specific evidence as to the accumulation of debt since that time. The record also lacks any evidence of the existence of non-disclosed bank accounts containing this

### Discussion

This matter comes before me on the Trustee's Motion to Dismiss the case for "cause" under 11 U.S.C. § 707(a) or for "substantial abuse" under § 707(b). I will separately address the applicability of each.

### Section 707(a)

The primary cause asserted by the Trustee for dismissal of the case under § 707(a) is that the Petition was filed in bad faith. Although § 707(a) does not list bad faith as an enumerated cause, the statute's use of the term "including" means that the enumerated causes are not exhaustive; consequently, a case may be dismissed under 11 U.S.C. § 707(a) for a lack of good faith in the filing of the Petition. *In re Zick*, 931 F.2d 1124 (6th Cir.1991), *citing, In re Sky Group Int'l, Inc.*, 108 B.R. 86 (Bankr.W.D.Pa.1989); *In re Maide*, 103 B.R. 696 (Bankr.W.D.Pa.1989); *In re Brown*, 88 B.R. 280 (Bankr.D.Hawai'i 1988); *In re Bingham*, 68 B.R. 933 (Bankr. M.D.Pa.1987); *see also, In re Kempner*, 152 B.R. 37 (D.Del.1993); *In re Hammonds*, 139 B.R. 535 (Bankr.D.Colo.1992); *In re Jones*, 114 B.R. 917 (Bankr.N.D.Ohio 1990).

Once it is put at issue, a debtor has the burden of proving that his "faith" in filing his Petition was "good". *Hammonds*, 139 B.R. at 541; *Sky Group Int'l*, 108 B.R. at 90. "Good faith" is not defined in the Bankruptcy Code. There is no specific test for determining good or bad faith. "The facts required to mandate dismissal based upon a lack of good faith are as varied as the number of cases." *Zick*, 931 F.2d at 1127 (*quoting Bingham*, 68 B.R. at 935). Courts have held, however, that at the very least, good faith requires a showing of "honest intention". *Hammonds*, 139 B.R. at 541; *In re Campbell*, 124 B.R. 462, 464 (Bankr.W.D.Pa.1991); *Sky Group Int'l*, 108 B.R. at 90; *Bingham*, 68 B.R. at 935. The courts have further held that "[a] determination of bad faith can be

made only on an ad hoc basis and depends on whether any abuses of the provisions, purpose, or spirit of bankruptcy law have occurred." *Hammonds*, 139 B.R. at 542; *Sky Group Int'l*, 108 B.R. at 90; *Bingham*, 68 B.R. at 935. "Dismissal based on lack of good faith ... should be confined carefully and is generally utilized only in those egregious cases that entail ... excessive and continued expenditures, lavish lifestyles, and intention to avoid a large single debt based upon conduct akin to fraud...." *Zick*, 931 F.2d at 1129.

When considering whether a debtor's lifestyle is "lavish", a court may consider whether items he has purchased have been "luxury goods". The Code does not define "luxury goods" other than in the negative; " 'luxury goods and services' do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor." 11 U.S.C. § 523(a)(2)(C). In the absence of a more affirmative definition, opinions dealing with the term "luxury" have "considered whether under circumstances of each particular case the purchases or transactions were 'extravagant,' 'indulgent,' or 'nonessential.' " *In re Hernandez*, 208 B.R. 872, 880 (Bankr.W.D.Tex. 1997); *citing, Carroll & Sain v. Vernon (In re Vernon)*, 192 B.R. 165, 170 (Bankr. N.D.Ill.1996). "An item, therefore, need not be purchased on Fifth Avenue to be considered a 'luxury'. Rather, factfinders are to examine the circumstances surrounding the purchase or transaction to determine whether the transactions should be classified 'luxury' in a given case." *Hernandez*, at 880 (citations omitted). *Hernandez* held that a debtor's purchase of new rugs, phones, and draperies a short time pre-petition were "luxury goods," for purposes of § 523(c). The court believed that the purchases satisfied no purpose other than beautifying the debtors' home and satisfying their material desires. *See also, In re Kamen*, 231 B.R. 275 (Bankr. N.D.Ohio 1999), (Chapter 7 petition of fi-

cash. Thus, I can arrive at no conclusion as        to Debtors' actual disposition of the funds.

nancially sophisticated debtor and unemployed spouse dismissed for bad faith where, shortly pre-petition, debtors substantially remodeled home, leased three cars, did not even attempt to modify their lifestyle, and incurred over $160,000 credit card debt to fund that lifestyle).

[9] Applying the principals of the above-discussed cases to the instant facts, I find that the Debtors have failed to demonstrate their good faith in filing the instant Petition. I base this finding on the following facts.

First and foremost, Lacrosse's receipt of cash from his clients in exchange for unsecured promissory notes and use of such cash to fund a lifestyle beyond his means constituted the perpetration of a fraud. Although Lacrosse denied the Trustee's witnesses' assertions that he told them he was going to invest their money, I find the testimony of those witnesses more credible. I must conclude that these intelligent people would not have simply given substantial sums of money to Lacrosse based on a mere promise by him to repay.

■ Even if I did not find the UST's witnesses more credible than Lacrosse, I still would find his conduct fraudulent. Lacrosse admitted that he did not voluntarily disclose to any client that he would be using their money to service his mounting credit card debt. I find the non-disclose of such a material fact to be fraudulent for purposes of § 707(a). "Bankruptcy courts have overwhelmingly held that a debtor's silence regarding material fact can constitute a false representation actionable under section 523(a)(2)(A)." *In re Van Horne*, 823 F.2d 1285, 1288 (8th Cir.1987) *(collecting cases)*. I see no reason to distinguish fraud under section 523(a)(2)(A) from fraud for purposes of section 707(b).

I give no credence to Lacrosse's testimony that he fully intended to repay all his clients through, primarily, further cash advances taken from credit cards. Even if I were to find Lacrosse's testimony on this point to have accurately reflected his actual intent at the time, I cannot find a substantive intent to repay based largely on the creation of new debt to pay off old debt.

In *In re Wilson*, 125 B.R. 742 (W.D.Mich.1990) the court held that a debtor committed fraud, for purposes of a § 707(b) dismissal, where she charged cash advances from one credit card to make minimum payments on another card in order to keep creditors unaware of her mounting debt. Similarly, in *In re Dobbs*, 115 B.R. 258 (Bkrtcy.D.Idaho 1990) the court considered evidence that it was common practice in the building trades to use deposits from future construction projects to pay off subcontractors on prior jobs. The court observed that "the fact that it may be common for residential building contractors to rob Peter to pay Paul... should not insulate the builder from a claim of fraud unless the practice is clearly disclosed to or understood by the prospective customers." *Id.*, at 266.

■ In the matter before me, Debtor admitted that he did not inform his clients that he was using their funds to pay his personal debts. He did not inform the credit card holders that he was borrowing money in order to pay them. As the court succinctly stated in *Mickel–Hopkins, Inc. v. Frassinetti*, 278 F.2d 301, 305 (4th Cir. 1960), "[r]obbing Peter to pay Paul is not a policy meriting judicial favor."

I find Debtors lifestyle to have been "lavish" in light of their aggregate earnings. Lacrosse was only able to purchase his current home by borrowing funds from a client to place into his savings account to, in turn, convey a false impression to a lender regarding his net worth. Lacrosse asserted no special need to purchase this particular home rather than a more modest one. His home was beyond his means and therefore, a luxury. Clearly, his Cadillac and Grand Cherokee were also luxury items. Debtor testified that he needed these specific models because his weight of

nearly 300 pounds prevented him from comfortably fitting into less expansive vehicles. Without discussing the relative passenger compartment dimensions of Cadillacs versus Fords (or any other make and model), I note that even if Debtor "needed" a Cadillac, he certainly did not "need" a brand new one, and could surely have found a used vehicle of equal dimensions at a substantially lesser price.

For these reasons, I conclude that the Debtors' case should be dismissed for cause, that cause being their lack of good faith in filing their Petition. I note that lack of good faith in filing may also indicate substantial abuse under § 707(b), *see*, *In re Uddin*, 196 B.R. 19, 22 (Bankr. S.D.N.Y.1996), so that dismissal of this case under that section may be merited as well. However, I find section 707(a) to provide more than sufficient basis for dismissal here, and so I need not discuss the matter under section 707(b). An appropriate order will be entered.