RHESA HAWKINS BARKSDALE, Circuit Judge:
Rehearing en banc was granted to determine, for credit card debt (card-debt), the standards for bankruptcy nondis-chargeability under 11 U.S.C. § 523(a)(2)(A) (credit obtained by false pretenses/representation or actual fraud). Primarily at issue are: whether credit card use (card-use) constitutes a representation of intent to pay the loan thereby obtained (intent to pay); and, if so, whether the issuer may justifiably rely on it. AT&T Universal Card Services (UCS) appeals the district court’s judgment affirming the bankruptcy court’s decision that the debt from Constance P. Mercer’s “pre-approved” UCS card is dischargeable. We REVERSE and REMAND.
I.
In September 1995, when Mercer received UCS’ pre-approved card-solicitation, she was employed as a paralegal, having worked approximately 20 years; had a junior college degree and gross annual income of approximately $25,000; and was familiar with card accounts and how obligations arise with them. She had begun gambling in casinos in 1993; as of UCS’ 1995 solicitation, she had developed a “gambling obsession”, financed by winnings and cash advances through card-use. That year, she began having problems paying her bills and acquired at least six more cards (four before UCS’ that November).
UCS’ solicitation followed a screening process begun months earlier. The credit bureau listed prospects based on UCS criteria, such as total revolving debt, bankruptcies, and existing credit utilization; a risk score was established for each prospect. That score predicted the probability of an account, within a one-year period, being delinquent for 60-90 days or more. The maximum score was 900; UCS required a minimum of 680. Mercer’s was 735, evaluated at trial by UCS as “very good”.
From the resulting prospects, an outside vendor eliminated duplicates and those who either had requested not to be solicited or were located in high fraud areas. Those remaining were matched against UCS’ internal risk and scoring models. For those still remaining, the credit bureau screened again to ensure no change in credit history or standing. As the Fair Credit Reporting Act requires (according to UCS), UCS offered a pre-approved card to each post-second-screening prospect (including Mercer).
In September 1995, Mercer completed, signed, and returned her acceptance to UCS, providing, among other things, her income ($24,500) and identifying data, such as her social security number. UCS *400 checked this information against its database. A third credit bureau screening determined Mercer’s ability to service a $3,000 credit line (limit). Had there been any deterioration in credit history, UCS would have either withdrawn the offer or offered a lower limit.
On 10 November 1995, UCS opened Mercer’s account, with a $3,000 limit, and provided a card and cardmember agreement (card-agreement). The agreement stated, inter alia: it was effective upon card-use; Mercer was “responsible for all amounts owed”; and she “agree[d] to pay such amounts according to the [card-agreement’s] terms” (by making at least a minimum payment in each billing cycle against the balance due).
Mercer reached her limit within a month of card-receipt, obtaining 14 cash advances. Each was used for gambling. Four were on or before 24 November, from an automatic teller machine (ATM) at a casino; nine, between 28 November and 11 December, from an ATM at a bank; and one, from another entity. On 29 November, 19 days after card-issuance but before Mercer reached her limit, her account was flagged by UCS for excessive transactions. UCS determined they were not egregiously excessive and cleared the account for further use.
Mercer’s last card-use was on 11 December, only a month after card-issuance. Her first UCS monthly statement (through mid-December), reflected a balance approximately $200 over-limit. The minimum payment was not made.
The second statement requested the required payment and no card-use. When contacted twice in February by UCS, Mercer stated: she was trying to become current, and did not know when she could make a payment; later (62 days post last card-use), that she had consulted an attorney about bankruptcy. The final statement (ending mid-March) advised the account had been closed. Quarterly, UCS reviewed its customers’ creditworthiness. But, because Mercer’s limit had been reached during the first billing cycle, her review was irrelevant. Notwithstanding her claimed inability to make the minimum payments, Mercer’s checking account statements for that period reflect numerous ATM cash withdrawals, including in casinos. For example, that for 17 January 1996 reflected 26, totaling approximately $2,200.
On filing for Chapter 7 bankruptcy relief in April 1996, Mercer was indebted to nine card-issuers for more than $31,000. Most of those accounts (including with UCS) had been opened between March and December 1995. She had lost approximately $36,000 in gambling within two years prior to filing bankruptcy, including at least $25,000 in 1995, when her income from two jobs was approximately $24,000.
Following trial in 1997, Mercer’s UCS debt was held dischargeable, the bankruptcy court ruling: for card-issuance, UCS relied on its own investigation, rather than on any representation by Mercer; therefore, UCS could not rely on her representation, “if any”, at card-use; and, even assuming UCS actually relied on any Mercer representation, it would not have been justifiable, because UCS’ pre-issuance investigation was inadequate. AT&T Universal Card Servs. v. Mercer (In re Mercer), 220 B.R. 315, 326-27 (Bankr. S.D.Miss.1998).
The district court affirmed, AT&T Universal Card Servs. v. Mercer, No. 1:98cv290BrR (S.D. Miss. 30 Sept. 1998) (unpublished), as did a divided panel on our court; but the majority could not agree. AT&T Universal Card Servs. v. Mercer (Matter of Mercer), 211 F.3d 214, reh’g granted, 218 F.3d 770 (5th Cir.2000). *401 One member concluded: UCS having provided a pre-approved card and limit, “Mercer could not make any false representations” on which UCS could rely; and it had assumed the risk of non-payment. 211 F.3d at 217 (Duhé, J.) (emphasis added). The other concluded: card-use is an implied promise to pay; but, UCS could not justifiably rely on it “without a reasonably adequate assessment of [Mercer’s] credit history and present financial condition”. Id. at 218 (Dennis, J., specially concurring). The dissent concluded: card-use is a representation of intent to pay; and the case should be remanded for application of the correct justifiable reliance standard. Id. at 231-32 (Barksdale, J., dissenting).
II.
Although the amount of the debt at stake in this nondischargeability proceeding is relatively small, card-debt is involved in many consumer bankruptcies. Accordingly, it is imperative that we clarify the standards governing nondischarge-ability of card-debt.
Cards play a major role in, and promote, modern commerce. A few examples of their ever-increasing uses and importance follow. Cards are a convenient — if not necessary — substitute for cash and checks, especially where they are not a viable medium, such as in telephone and Internet purchases. See Todd J. Zywicki, The Economics of Credit Cards, 3 Chap. L.Rev. 79, 83, 91-92 (Spring 2000). They help small retailers compete with larger ones, many of which have them own credit operations, by allowing the former to shift the risk of non-payment to the issuer. Id. at 92-93. Finally, cash advances, the focus of the case at hand, are a prompt, simple, and extremely convenient alternative to bank loans.
The downside for increased consumer credit is bankruptcy. See David F. Snow, The Dischargeability of Credit Card Debt: New Developments and the Need for a New Direction, 72 Am. Bankr.L.J. 63, 94 (Winter 1998) (readily available cards “tempt consumers, hard-pressed by loss of work, illness, or family difficulties, to attempt to tide themselves over and to postpone financial collapse or bankruptcy with little or no realistic prospect of success”). Filings increased from approximately 800,-000 in 1990 to 1.4 million in 1998 (decreasing somewhat in 1999 and 2000). See AMERICAN BankrInst., Annual Total Bankruptcy Filings For 1990-1999, available at < http:// www. abiworld. org/stats/newstats-front.html> (last checked 15 Mar. 2001). “[B]ank, retail and credit-card industry advocates estimate consumer bankruptcies cost their businesses about $40 billion a year”. Dawn Kopecki & Jeffrey Taylor, House, Senate Diverge on Bills For Bankruptcy, Wall St. J., 4 Feb. 2000, at A20. As expected, that cost is passed along to customers. Bankruptcies are said to cost each United States household $400 annually, in part because, to recoup losses, issuers and other businesses increase customers’ interest rates. Julie Hyman, Senate Set to Pass Legislation to Curb Bankruptcy Abuse, Wash. Times, 2 Feb. 2000, at B8.
Our court has not addressed the standards for card-debt § 523(a)(2)(A) non-dischargeability (card-dischargeability). Numerous others have, with conflicting theories emerging. Because of the issue’s importance, the need for a uniform standard, and the many subissues in this case, arising out of a pre-approved card being used to obtain funds for gambling, we address each element in detail.
In this regard, there is no statutory basis for distinguishing between cards obtained at the debtor’s initiative and those *402 obtained in response to a solicitation (pre-approved). Accordingly, although this ease involves a pre-approved card, the standard we adopt- — -common-law fraud — is not so confined. Moreover, irrespective of how the debtor obtained the card, his intent to pay representation, and the creditor’s (issuer’s) actual reliance thereon, are the same. On the other hand, a card’s pre-approval may be relevant as to whether that reliance was, justifiable.[2]
Section 523(a)(2)(A) excepts from discharge, inter alia, “any debt ... for ... an extension ... of credit, to the extent obtained by ... false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor’s ... financial condition ”. 11 U.S.C. § 523(a)(2)(A) (emphasis added). UCS contends that, with each card-use: Mercer knowingly falsely represented her intent to pay; and the bankruptcy court applied an incorrect standard in determining UCS failed to prove actual and justifiable reliance.
We apply the same standard of review as did the district court: the bankruptcy court’s factual findings are reviewed for clear error; its legal conclusions and mixed questions of fact and law, de novo. E.g., Randall & Blake, Inc. v. Evans (Matter of Canion), 196 F.3d 579, 584 (5th Cir.1999). But, of particular importance to this case, the clear error standard does not apply to findings of fact resulting from application of an incorrect legal standard. See Fabricators, Inc. v. Technical Fabricators, Inc. (Matter of Fabricators, Inc.), 926 F.2d 1458, 1464 (5th Cir.1991).
A.
“The operative terms in § 523(a)(2)(A), ... ‘false pretenses, a false representation, or actual fraud,’ carry the acquired meaning of terms of art ... [and] are common-law terms”. Field v. Mans, 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). “[W]here Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms”. Id. (internal quotation marks, ellipses, and citations omitted).
In Field, the debtor purchased real estate from the Fields; they provided financing, requiring their consent to a subsequent conveyance. Id. at 61-62, 116 S.Ct. 437. Failing consent, the balance was due. Id. at 62, 116 S.Ct. 437. Without the Fields’ consent, the property was conveyed; without disclosing that, the debtor asked them to waive the balance-due provision. Id.
The sole issue before the Court was “the level of relianee that § 523(a)(2)(A) requires a creditor to demonstrate”. Id. at 63, 116 S.Ct. 437. Field concerned “actual fraud”, one of § 523(a)(2)(A)’s three non-dischargeability bases. Id. at 69, 116 S.Ct. 437. Although “not meaning] to suggest that the requisite level of rebanee would differ if there should be a case of false pretense or [false] representation but not of fraud”, the Court did not settle the question. Id. at 70 n. 8, 116 S.Ct. 437 (emphasis added).
For the common-law understanding of “actual fraud” in 1978 (when that term was added to § 523(a)(2)(A) by the Bankruptcy Reform Act of 1978, Pub.L. 95-598, 92 Stat. 2590), the Court looked to “the most widely accepted distibation of the common *403 law of torts” — the Restatement (Second) of Torts. Field, 516 U.S. at 70,116 S.Ct. 437. The Restatement, however, does not define “fraud”, much less “actual fraud”; instead, it discusses “fraudulent misrepresentation”.
Prior to Field, some courts defined differently § 523(a)(2)(A)’s three bases. See, e.g., Montgomery Ward & Co., Inc. v. Blackburn (In re Blackburn), 68 B.R. 870, 876 (Bankr.N.D.Ind.1987). Likewise, our court has applied different, but somewhat overlapping, elements of proof for § 523(a)(2)(A) actual fraud, as opposed to false pretenses/representation. See RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1292-93 (5th Cir.1995) (for false pretenses/representation, knowing and fraudulent falsehood describing past or current facts that creditor relied upon; for actual fraud, knowingly false representation with intent to deceive creditor, who relied on it and therefore sustained loss). We are not required to address whether such distinctions survived Field.[3]
UCS did not specify on which of the three bases it relied. It has contended throughout, however, that, similar to the earlier listed elements for “actual fraud” described in Pentecost, Mercer made a knowingly false representation, with intent to deceive, upon which it relied in extending her credit. Both parties have briefed those elements. Likewise, most courts considering card-dischargeability have applied elements similar to those described in Pentecost for “actual fraud”.[4]
Those elements are appropriate for determining card-dischargeability because, as discussed infra, card-use lends itself to that analysis. Accordingly, for each card-use, and by a preponderance of the evidence, Grogan v. Garner, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), UCS was required to prove: (1) Mercer made a representation; (2) it was knowingly false; (3) it was made with the intent to deceive UCS; (4) UCS actually and justifiably relied on it; and (5) UCS sustained a loss as a proximate result of its reliance.
B.
Resolution of the issue at hand requires examining Davison-Paxon Co. v. Caldwell, 115 F.2d 189 (5th Cir.1940), cert, denied, 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), which held: excepted from discharge were only debts obtained by “actual overt false pretense or representation”, not those “created by obtaining credit through concealment of insolvency and present inability to pay”. Id. at 191 (emphasis added). “The rationale underlying Davison-Paxon has been severely eroded in the modern world of credit transactions and the decision has been the subject of much criticism.” Sears, Roebuck & Co. v. Boydston (Matter of Boydston), 520 F.2d 1098, 1101 (5th Cir.1975).
Davison-Paxon was governed by § 523(a)(2)(A)’s predecessor, § 17(a)(2) of the Bankruptcy Act of 1898. It excepted, inter alia, “liabilities for obtaining money or property by false pretenses or false *404 representations”. 11 U.S.C. § 35(a)(2) (repealed 1979); see Field, 516 U.S. at 64-65 & n. 5, 116 S.Ct. 437. “Actual fraud” was added as a nondischargeability basis, some suggest, in order to eliminate Davisoru-Paxon’s distinction between “overt” and “implied” misrepresentation.[5] Since the amendment, Davison-Paxon has caused confusion among our circuit’s bankruptcy courts.[6]
When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required. See Restatement (Second) of Torts, §§ 550, 551; Citibank (S.D.), N.A. v. Eashai (In re Eashai), 87 F.3d 1082, 1089 (9th Cir.1996). Moreover, a misrepresentation need not be spoken; it can be made through conduct. See id. § 525 cmt. b. Accordingly, Davison-Paxon retains no validity; it is overruled.
C.
“The difficulty in credit card cases is for the creditor, who does not deal face-to-face with the debtor, to prove the elements of misrepresentation and reliance.” Eashai, 87 F.3d at 1087 (emphasis added); see also AT&T Universal Card Servs. Corp. v. Feld (In re Feld), 203 B.R. 360, 365-66 (Bankr. E.D.Pa.1996). The bankruptcy court’s finding no actual and justifiable reliance on any representations by Mercer was premised on an erroneous interpretation of the law. It did not address the other elements for card-dischargeability.
Based on our review, UCS has proved three of the five elements and part of another; for the balance, we must remand for fact-finding. Through each card-use, Mercer represented her intent to pay. A question of fact for remand is whether the representation was knowingly false. If so, intent to deceive is present. In authorizing the loan, UCS actually relied on the representation; whether that was justifiable is a question of fact for remand. Finally, UCS’ loss (unpaid loan) was proximately caused by its reliance.
1.
A representation of intent to pay was made at card-use, not at card-issuance. Mercer’s card being pre-approved did not preclude the representation.
Many earlier cases held that, by card-use, the debtor represented both intent and ability to pay.[7] The “ability” factor has been criticized for improperly shifting the burden of proof, making the debtor a guarantor of her financial condition,[8] and because it gives preferential *405 treatment to issuers, making card-debt too easily nondischargeable.[9] Moreover, even if card-use could be understood as a representation not only of intent, but also ability, to pay, the latter is not actionable under § 523(a)(2)(A); as noted, it excludes from its scope “a statement respecting the debtor’s ... financial condition ”. 11 U.S.C. § 523(a)(2)(A) (emphasis added).[10]
Many, more recent, cases hold that card-use is a representation of intent to pay (with payments pursuant to the card-agreement schedule).[11] When the representation is confined to intent, not ability, to pay, there is no risk it will have the undesirable consequence of making the debtor a guarantor of her financial condition.[12] Mercer apparently agrees. In her appellate briefs, she implicitly concedes that, with each card-use, she represented her intent to pay. On the other hand, several bankruptcy courts have held card-use is not a representation. For example, AT&T Universal Card Servs. v. Alvi (In re Alvi), 191 B.R. 724, 731 (Bankr.N.D.Ill. 1996) (emphasis added), held it “involves no representation, express or implied”.[13]
Alvi, 191 B.R. at 731-32, relied on Williams v. United States, 458 U.S. 279, 102 S.Ct. 3088, 73 L.Ed.2d 767 (1982). Williams had been charged with a crime under 18 U.S.C. § 1014 (knowingly false statement to influence action of certain financial institutions). Id. at 282,102 S.Ct. 3088. Applying the rule of lenity, the Court rejected the Government’s contention that “a drawer [of a check] is generally understood to represent ... he ‘currently has funds on deposit sufficient to cover’ ” it, id. at 285, 290, 102 S.Ct. 3088, holding: “a check is not a factual assertion at all, and therefore cannot be characterized as ‘true’ or ‘false’ ”, and thus “did not make any representation as to the state of [Williams’] bank balance”. Id. at 284-85, 102 S.Ct. 3088 (emphasis added). Alvi reasoned: “[t]he similarities between the issuance of a check” and card-use compel concluding that ordinary card-use is not a representation; accordingly, card-use “in [and] of itself is not capable of being true or false”. Alvi, 191 B.R. at 732 (emphasis added).
Williams does not compel that conclusion. Even assuming a check is a representation of sufficient funds, this would be a statement respecting financial condition, not actionable under § 523(a)(2)(A). In any event, the drawer does not request an extension of credit from his bank; instead, he draws on his funds on deposit. If they are not sufficient to cover the check, the bank will not honor it. Because the drawer is not seeking an extension of credit from his bank, he is not making a representation, by check-use, of intent to pay a loan from his bank. On the other hand, card-use is both a request to the issuer for a loan against a line of credit and a promise to pay. Inherent in the loan’s being made (and the consideration therefor) is *406 that promise; without it, there is no loan, merely a gift. See LA Capitol Fed. Credit Union v. Melancon (In re Melancon), 223 B.R. 300, 311 (Bankr.M.D.La.1998). Moreover, Field, decided after, and unlike, Williams, concerns a civil statute. Field directed that § 523(a)(2)(A) be interpreted in accordance with the common law.[14]
We agree with the Ninth Circuit that each card-use forms a unilateral contract: the holder “promises to repay the debt ... and the ... issuer performs by reimbursing the merchant who ... accepted the ... card in payment”. Anastas v. American Sav. Bank (In re Anastas), 94 F.3d 1280, 1285 (9th Cir.1996) (emphasis added); see Restatement (Seoond) of Contracts § 31 cmt. b (where each loan is “the sole consideration for the corresponding part of the [continuing] guaranty [for future loans], the guaranty is often characterized as an offer for a series of separate contracts”), cited in Anastas, 94 F.3d at 1285.[15] Mercer understood that, on card-issuance, UCS established a line of credit for her, providing the opportunity to obtain goods, services, and cash from entities with which UCS had contracted, with UCS reimbursing the merchants and looking to her for payment. Her card-agreement provided, inter alia: card-use signified acceptance of the agreement, including the obligation to pay the charges by making at least the minimum monthly payments.
Of course, by card-acceptance, Mercer was not obligated to use that credit. But, by card-use, she requested a loan against that line; and, by approving each card-use, and therefore reimbursing the merchant, including an ATM owner, UCS made a loan to her. See Melancon, 223 B.R. at 311. Her promise to pay occurred not when the line was established, but at card-use, when the loan was made. See id. With each card-use, Mercer did not say anything to UCS. Again, her card-use (conduct) was a loan request and promise to pay. See Feld, 203 B.R. at 367 (absence of express statement with card-use “completely consistent with fraud doctrine”, which recognizes representation can be made through conduct).
The common law of fraud supports a representation througn card-use. The Restatement does not define “representation”; it does define “misrepresentation”, which “ denote[s] not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth”. Restatement (Second) of Torts, § 525 cmt. b (emphasis added). A misrepresentation can be one of “fact, opinion, intention or law”. Id. § 525 (emphasis added).
*407 If, as here, the misrepresentation concerns intention to perform an agreement, that intention “may be expressed but it is normally merely to be implied from the making of the agreement”. Id. § 530 cmt. c (emphasis added). “[A] promise necessarily carries with it the implied assertion of an intention to perform ”. Id. (emphasis added). Accordingly, Mercer’s card-use representation included her “implied assertion of an intention to perform”. Id. (emphasis added).
Likewise, it is of no moment that, with card-use, Mercer did not deal directly with UCS, but instead with the merchant (including through an ATM machine) which accepted her card. Based on her testimony, Mercer “intend[ed], or ha[d] reason to expect [her card-use representation would be] communicated to [UCS], and that it [would] influence [UCS] conduct ”. Id. § 533 (emphasis added).[16]
Scienter distinguishes “actual” or “positive” fraud from “constructive” fraud, or that “implied by law”; fraud actionable under § 523(a)(2)(A) is the “positive” type. See, e.g., Ames v. Moir, 138 U.S. 306, 311, 11 S.Ct. 311, 34 L.Ed. 951 (1891) (“fraud in the act ... defining [nondischargeability] ... means positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, ... and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality” (emphasis added; internal quotation marks omitted)); Anastas, 94 F.3d at 1286 (same under § 523(a)(2)(A)); Pentecost, 44 F.3d at 1292 (same). Inferring, from card-use, a representation of intent to pay does not violate this principle; under § 523(a)(2)(A), the creditor still must prove all of the other elements of fraud, including scienter (knowingly false representation).[17]
2.
The appropriate focus with respect to a debtor’s intent is whether she acted in bad faith by knowingly making a false representation. The bankruptcy court did not address whether Mercer’s representations were knowingly false. “A misrepresentation is fraudulent if the maker ... knows or believes ... the matter is not as” represented, or “does not have the confidence in the accuracy of his representation” as stated or implied, or “knows ... he does not have the basis for his representation” as stated or implied. Restatement (Second) of Torts § 526 (emphasis added). “A representation of the maker’s *408 own intention to do ... a particular thing is fraudulent if he does not have that intention.” Id. § 530(1) (emphasis added). “If he does not have it, he must of course be taken to know that he does not have it.” Id. § 530 cmt. b (emphasis added); see also Melancon, 223 B.R. at 319 (“one always knows his present intentions”).
a.
The card-use representation of intent to pay is false if there is use without that intent. See, e.g., Anastas, 94 F.3d at 1285; American Express Travel Belated Servs. Co., Inc. v. Hashemi (In re Hashemi), 104 F.3d 1122, 1126 (9th Cir.), cert. denied, 520 U.S. 1230, 117 S.Ct. 1824, 137 L.Ed.2d 1031 (1997). Many courts have listed various factors to consider in determining whether the card-user’s representation was made with the requisite scienter. In Eashai, 87 F.3d at 1090, the Ninth Circuit referenced the 12 factors listed in Citibank S.D., N.A v. Dougherty (In re Dougherty), 84 B.R. 653, 657 (9th Cir. BAP 1988): the time between card-use and the bankruptcy filing; whether, prior to card-use, an attorney was consulted about bankruptcy; the number of charges; their amount; the debtor’s financial condition at card-use; whether the limit was exceeded; whether multiple charges were made on the same day; whether the debtor was employed; her employment prospects; her financial sophistication; whether her buying habits changed suddenly; and whether luxuries or necessities were purchased. See also, e.g., Rembert, 141 F.3d at 282; Feld, 203 B.R. at 367 & n. 9. Others have rejected their use.[18]
We agree with the Ninth Circuit that such “factors are nonexclusive; none is dispositive, nor must a debtor’s conduct satisfy a minimum number” to constitute fraudulent intent. Hashemi, 104 F.3d at 1125. In most instances, a bankruptcy court’s consideration of these factors will be helpful. It should consider them, together with any other facts and circumstances it may find proper, in determining whether, at card-use, the debtor knew her representation was false.
In this regard, and as the Ninth Circuit has stressed, the debtor’s financial condition at card-use is only one of many factors to consider, and should not be the sole basis for finding fraudulent intent. Anas-tas, 94 F.3d at 1285-86.[19] Our precedent in Boydston, 520 F.2d 1098, is not at odds with this.
Boydston concerned credit purchases; the creditors claimed the debts were non-dischargeable under the predecessor to § 523(a)(2)(A), asserting acquisition with no intent to pay. Id. at 1099-1100. The bankruptcy court found they failed to establish subjective intent not to pay; our court found no clear error. But, it stated: “where hopeless insolvency at the time of the purchases makes payment impossible, fraudulent intent may be inferred”. Id. at 1101 (emphasis added). Although this appears to conflict with the Ninth Circuit’s much later statement in Anastas, the point being made in Boydston was that hopeless insolvency, when the charges were made, was “merely one method of establishing” the debtor’s “subjective intent not to pay ”. *409 Boydston, 520 F.2d at 1101 (emphasis added).
To the extent Boydston could be interpreted as requiring a bankruptcy court to infer fraudulent intent solely on the basis of “hopeless insolvency” at card-use, it would be inconsistent with the Restatement. It requires, instead, that the inquiry focus on the debtor’s subjective intent, with such “hopeless insolvency” simply being “evidence from which his lack of honest belief may be inferred”. Restatement (Second) of Torts § 526 cmt. d (emphasis added); see also Feld, 203 B.R. at 365 (Field and Restatement make clear that, under common law, subjective standard must be applied in determining fraudulent intent).
Accordingly, “hopeless insolvency”, or inability to pay, at card-use may support finding the debtor did not intend to pay, but only if she was aware of her financial condition and knew she could not (and therefore did not intend to) make even the minimum monthly payment to the issuer. See Restatement (Second) of Torts § 530 cmt. d (intention not to perform “may be shown by any ... evidence that sufficiently indicates its existence, as, for example, the certainty that he would not be in funds to carry out his promise” (emphasis added)); Melancon, 223 B.R. at 321 (“If the debtor has no idea how the money will get paid back, or if it will get paid back, then he may hope to repay — he may even want to repay — but he certainly does not intend to repay.” (emphasis added)).
A debtor rarely will admit card-debt is incurred with the intention of not paying it; therefore, the creditor may rely on circumstantial evidence to prove the debtor’s state of mind at card-use.[20] In order to prove a debtor’s fraudulent intent under § 523(a)(2)(A), the creditor must present sufficient evidence to convince the trier of fact that, as discussed, the debtor made the statement of intent in bad faith — that is, knowing it was false. Pentecost, 44 F.3d at 1292. In this regard, the aim of the objective factors enumerated swpra is to discern the debtor’s subjective intent. Citibank (S.D.), N.A. v. Michel, 220 B.R. 603, 606 (N.D.Ill.1998) (“[o]bviously the court must consider evidence that is probative of the debtor’s intent to repay in addition to considering the debtor’s demeanor, but the ultimate inquiry still seeks to determine the debt- or’s subjective intent”). Ultimately, in cases such as this one, where a debtor testifies as to her subjective intent, the bankruptcy court must make a credibility determination, considering the debtor’s testimony, along with other objective circumstantial evidence of the debtor’s subjective intent. See Matter of Sheridan, 57 F.3d 627, 633-34 (7th Cir.1995) (while certain objective circumstantial evidence may support an inference of fraud, it does not compel such a conclusion when the trial judge finds the debtor’s contrary testimony to be credible). Accordingly, on remand, in addition to Mercer’s testimony that she intended to pay, all of the facts and circumstances surrounding her card-use may be considered in determining Mercer’s subjective intent.
b.
Cases such as this one, involving card-use to finance gambling, with the claim of intent to pay with gambling win *410 nings, present a particularly difficult challenge for determining whether the debtor, at card-use, subjectively intended to pay.[21] Obviously, gamblers gamble with the hope of winning, not losing. Mercer so testified. But, hoping to win is not synonymous with intending to pay. “A statement of intent (I will repay) is distinguishable from a hope or a desire to [do so. It] ... suggests a plan to repay [, and] ... an anticipated source of funds from which [it] might be made.” Melancon, 223 B.R. at 336. Accordingly, if a debtor presents evidence of alternative sources of expected-income sufficient to make her minimum payment, her intent with regard to her gambling winnings would be less relevant.
Therefore, in determining whether Mercer subjectively intended to pay card-loans obtained to finance gambling, one relevant inquiry is what Mercer intended to do with any winnings. Did she intend to use them to pay her card-debt, or to finance more gambling? See id. at 336-41 (suggesting court should inquire whether debtor has ever gambled and won, and what she did with winnings).
3.
The bankruptcy court did not consider intent to deceive. Of course, if the debtor does not know the representation is false, there is no misrepresentation; therefore, she does not intend to deceive. See FCC Nat’l Bank/First Card v. Friend (In re Friend), 156 B.R. 257, 262 (Bankr. W.D.Mo.1993). Nevertheless, the Restatement treats the elements separately. See Restatement (Seoond) of Torts § 526 cmt. b (§§ 526-530 state “rules that determine whether a representation is fraudulently made”; §§ 531-36, rules regarding “maker’s purpose to induce the recipient to act in reliance upon the misrepresentation”); see also Chevy Chase Bank FSB v. Kukuk (In re Kukuk), 225 B.R. 778, 784 (10th Cir.BAP1998) (fraudulent nature of representation separate from intent to deceive to influence conduct).
Intent to deceive is present if the debtor “intends or has reason to expect [the creditor] to act or to refrain from action in reliance upon the misrepresentation”. Restatement (Second) of Torts § 531. “A result is intended if the actor either acts with the desire to cause it or acts believing that there is a substantial certainty that the result will follow from his conduct.” Id. § 531 cmt. c.
With card-use, and the concomitant representation of intent to pay, the cardholder’s intent is for the creditor, in reliance on that representation, to approve the requested loan. E.g., Melancon, 223
*411 B.R. at 324-25.[22] Accordingly, if the bankruptcy court finds that, by card-use, Mercer made a knowingly false representation of intent to pay, then the separate requisite intent to deceive is also present.
4.
UCS had the burden of proving not only that it actually relied on Mercer’s representation, but also that its reliance was justifiable. See Restatement (Second) of Torts § 537. The effect vel non of the card’s being “pre-approved” comes into play here.
a.
In bankruptcy court, the parties did not devote much attention to actual reliance. It is treated extensively here, for the most part, in order to respond to Judge Dennis’ dissent. The parties stipulated Mercer was familiar with card accounts and how obligations arise in connection with them; and she admitted that, through card-use, she incurred a debt to UCS. The trial’s focus was primarily on the scienter element and on justifiable reliance. Perhaps for that reason, most of the testimony of UCS’ bankruptcy specialist (UCS’ witness) dealt with UCS’ pre-card-issuance screening process and the information it had available to it before offering Mercer a pre-approved card. Concerning actual reliance, UCS’ witness testified as follows:
Q. Based on [UCS’] records with regard to this information, would [UCS] have extended credit to [Mercer] if it knew that she would not pay or did not have ability to pay for these charges on this account?
A. I would say no.
(Emphasis added.)[23]
This lack of emphasis on actual reliance is shown by Mercer’s closing argument instead being directed primarily at the representation and scienter elements. Contrary to her later appellate briefs’ position, she argued: card-use was not a representation of intent to pay. As a result, she did not expressly argue that UCS failed to prove actual reliance on card-use representations. Instead, she argued that, *412 at card-issuance, UCS did not rely on any representations by her.
In its bankruptcy court brief, UCS contended actual reliance was demonstrated by its extension of credit (loan) to Mercer at each card-use. Mercer’s responsive brief took a different approach: UCS could not show actual and justifiable reliance when, at or before card-issuance, it had an opportunity to make an adequate investigation; passively extending credit at card-issuance did not constitute reliance on subsequent card-use.
Regarding actual reliance, the bankruptcy court held:
[UCS] solely relied on its own agents and investigative processes to make its [card-issuance] decision. The evidence reflects nothing written, said or done by Mercer upon which [UCS] relied at any time [at card-use].
The court concludes that without the establishment of rebanee on [Mercer’s] representations at the time the card toas issued, rebanee will not attach to the representations, if any, made by [Mercer] with the subsequent use of the card. Under the circumstances of this case, where the credit card was pre-approved, based solely on [UCS’] screening process, performed through various credit bureaus and the [risk] score, there was no actual reliance by [UCS] on representations made by [Mercer].
Mercer, 220 B.R. at 326-27 (emphasis added).
The finding of “nothing written, said or done by Mercer upon which [UCS] rebed at” card-use, id., was influenced by an erroneous interpretation of the law as requiring reliance on representations by the debtor, regarding her financial condition, at card-issuance, in order for the issuer to rely on subsequent representations at card-use. Prior to the above-quoted passage, the bankruptcy court, 220 B.R. at 325-26, quoted at length from AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth), 212 B.R. 326 (Bankr. W.D.Mo.1997), which held: “[A] creditor cannot justifiably rely on any representation, or the absence thereof, made by a card holder if the card was pre-approved, and no direct financial information was obtained by the issuer”. Id. at 338 (emphasis added).
The actual rebanee inquiry must focus on the representations, through card-use, of intent to pay, even if, for card-issuance, the issuer rebed on its investigation of the debtor’s creditworthiness, rather than on any representations by her. Again, any such pre-issuance representations, regarding her financial condition, are not actionable under § 523(a)(2)(A), and cannot support actual reliance on subsequent card-use intent to pay representations. Because the bankruptcy court’s factual finding of no actual reliance on card-use representations is based on an incorrect interpretation of the law, it is not insulated by the clearly erroneous standard of review. See Fabricators, 926 F.2d at 1464.[24]
*413 The record does not contain briefs filed in district court. The district court held: the bankruptcy court correctly applied the law in determining whether UCS actually and justifiably relied on “Mercer’s representations, if any”; and the bankruptcy court did not clearly err in finding “the evidence reflects nothing written, said or done by Mercer upon which [UCS] relied at” card-use.
In its briefs before the panel, in addressing actual reliance, UCS contended: the bankruptcy court applied the wrong standard and “erroneously concluded that ... UCS did not actually rely on Mercer’s representations despite the uncontested fact ... it advanced the funds she requested [with] each” card-use; actual reliance was demonstrated by this credit extension; and her representation of intent to pay was a substantial factor in its making the requested loans. (Emphasis added.) In its supplemental (en banc) brief, UCS reiterated these contentions in support of its credit extension proving actual reliance on Mercer’s representations.
Mercer’s panel brief did not respond directly; it asserted, conelusorily, that the %0-actual-reliance finding should be affirmed. In her supplemental brief, Mercer, for the first time, attempted to respond, maintaining, consistent with the bankruptcy court, that, because UCS did not actually rely on any representations at card-issuance, it was precluded from relying on any at subsequent card-use.
“The recipient of a fraudulent misrepresentation can recover ... only if he in fact relies upon the misrepresentation ... and his reliance is a substantial factor in bringing about [his] loss.” Restatement (Second) of ToRts § 537 cmt. a (emphasis added). That comment refers to the Restatement’s rule on causation in fact, which provides, similarly, that the reliance must be “a substantial factor in determining the course of conduct that results in his loss”. Id. § 546 (emphasis added). Accordingly, actual reliance is the equivalent of causation-in-fact.[25]
The “standard of actual reliance requires little of the creditor”, City Bank & Trust Co. v. Vann (In re Vann), 67 F.3d 277, 284 (11th Cir.1995) (emphasis added); it must prove it “in fact relied upon the representations of the debtor”. Id. at 281. Moreover, as mentioned, such reliance need not be the “but-for” cause of the issuer’s actions: “It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.” Restatement (Seoond) of Torts § 546 cmt. b (emphasis added; citation omitted).
Courts that recognize card-use as an intent to pay representation generally *414 have concluded that the issuer’s extension of credit constitutes actual reliance on such representation.[26] Obviously, the debtor’s promise to pay is an essential factor in the issuer’s decision to make the requested loan; it would not do so without it. Likewise, the debtor’s card-use (conduct) causes the issuer’s loss when it reimburses the merchant and the debtor does not pay.[27]
Some bankruptcy courts have held an issuer’s “passive” extension of credit does not constitute reliance on card-use, that it “cannot sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation”. Aim, 191 B.R. at 731 (emphasis added).[28] Another line of cases holds that the issuer relies only on the cardholder’s card-agreement promise to pay, and not on any representations emanating from subsequent card-use. See GM Card v. Cox (In re Cox), 182 B.R. 626, 636 (Bankr. D.Mass.1995) (because card-agreement includes promise to pay, “it would be irrational for a fact finder to conclude [the issuer] relied upon a later [card-use] implied representation of intent to pay”).[29] We disagree with both lines of cases.
First, Alvi and its progeny also hold card-use is not a representation. We have rejected that proposition.
Second, for actual reliance, the representation at issue is the intent to pay the loan obtained through card-use. The fact that an issuer based its card-issuance decision on its investigation of the debtor’s creditworthiness does not preclude the issuer from relying also on the debtor’s subsequent card-use intent to pay representation. Similarly, consistent with the earlier-quoted Restatement (Second) of Torts § 546 comment b, reliance on the debtor’s card-agreement promise does not *415 preclude relying also on the card-use representation. Moreover, reliance on the card-agreement alone would be insufficient; again, there is no loan to pay until card-use.[30] See Melancon, 223 B.R. at 327 n. 37; see also Manufacturer’s Hanover Trust Co. v. Ward (In re Ward), 857 F.2d 1082, 1088-89 (6th Cir.1988) (Merritt, J., dissenting) (without issuer’s reliance on promise to pay through card-use, consideration is lacking, and contract is voidable; the opposite “result would undermine credit cards as a medium of exchange ” (emphasis added)).[31]
In sum, an issuer usually will be able to establish actual reliance by showing it would not have approved the loan in the absence of debtor’s promise to pay (through card-use). It is undisputed that, for each Mercer card-use, UCS authorized the requested loan. Obviously, her intent to pay representation, through card-use, was a substantial factor in UCS’ decision to make each loan. Equally obvious, if she had not used the card, UCS would not have made a loan; nothing would have occurred.[32] As a matter of *416 law, UCS actually relied on Mercer’s card-use representations.
b.
Concerning justifiable reliance, the Restatement has a special rule for representations of intention, as at issue here. Reliance is justifiable “if the existence of the intention is material and the recipient has reason to believe that it will be carried out”. Id. § 544 (emphasis added).
(1)
For the existence of the intention, the recipient is justified in relying on a representation only if it gives him “reason to believe that the intention is firmly entertained and, therefore, to expect that it will be carried out. Whether the recipient has reason for this belief depends upon the circumstances under which the statement was made, including the fact that it was made for the purpose of inducing the recipient to act in reliance upon it and the form and manner in which it was expressed”. Id. § 544 cmt. a.
For the existence of the intention being material, id. § 544 cmt. b; see also id. § 538(1), § 544’s commentary contains a cross-reference to § 538(2), which defines materiality. It is present when, in deciding on a course of action, “a reasonable man would attach importance to its existence” or “the maker of the representation knows or has reason to know ... its recipient regards or is likely to. regard the matter as important ..., although a reasonable man wcmld not so regard it ”. Id. § 538(2) (emphasis added).[33]
As a matter of law, the materiality element is present here: in determining whether to approve the loan requested by card-use, a reasonable issuer would attach importance to the existence of a cardholder’s representation of intent (promise) to pay that loan. See Melancon, 223 B.R. at 327 (“[i]f the representation is a necessary part of the transaction, ... it is material”).
*417 (2)
The second prong for justifiable reliance on a statement of intention is reason to believe the intention will be carried out. If the recipient “knows facts that will make it impossible for the maker to [carry out his intention, the recipient] cannot be justified in his reliance”. Restatement (Second) of Touts § 544 cmt. c (emphasis added).
The comment’s use of “knows”, and its omission of “should have known ”, suggest strongly that, for justifiable reliance on a representation of intention, the recipient is not required to conduct an investigation. Section 540 confirms this: “The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained [its] falsity ... had he made an investigation.” Id. § 540 (emphasis added).
This rule applies even when the investigation “could be made without any considerable trouble or expense.... On the other hand, if a mere cursory glance would have disclosed the [representation’s] falsity ..., its falsity is regarded as obvious .... ” Id. § 540 cmt. a (emphasis added). In this regard, “[t]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him”. Id. § 541 (emphasis added).
Field, which involved a misrepresentation of fact, relied on § 540 (no duty to investigate) in concluding that, for § 523(a)(2)(A) “actual fraud”, the standard is justifiable, not reasonable, reliance. Field, 516 U.S. at 70, 116 S.Ct. 437. But, § 540 speaks only about fraudulent misrepresentations of fact. The case at hand involves a representation of intention, prompting whether § 540 applies.
The answer is found in the commentary to § 525. As mentioned, § 525 provides the general rule of liability for fraudulent misrepresentations of fact, opinion, intention, or law.
Strictly speaking, “fact” includes not only the existence of a tangible thing or the happening of a particular event or the relationship between particular persons or things, but also the state of mind, such as the entertaining of an intention or the holding of an opinion.... There is sometimes, however, a marked difference between what constitutes justifiable rebanee upon statements of the maker’s opinion and what constitutes justifiable reliance upon other representations. Therefore, it is convenient to distinguish between misrepresentations of opinion and misrepresentations of all other facts, including intention.
Restatement (Second) of Torts § 525 cmt. d (emphasis added); see also Manufacturers Hanover Trust Co. v. Pannell (In re Pannell), 27 B.R. 298, 302 (Bankr. E.D.N.Y.1983) (“A person’s intent, his state of mind, ... is capable of ascertainment and a statement of present intention is deemed a statement of a material existing fact, sufficient to support a fraud action.” (emphasis added; internal quotation marks and citation omitted)).
Therefore, for justifiable reliance, one form of a representation of fact is one of intention. See Kukuk, 225 B.R. at 784 (comments to § 525 provide representations of fact include those of intention). Accordingly, § 540’s TCO-duty-to-investigate rule applies. Concomitantly, Field, even though it dealt with a representation of fact rather than of intention, is controlling with respect to whether an issuer has a duty to investigate.
In addition to its citing §§ 540 and 541, dealing with no duty to investigate and *418 obviousness of the representation’s falsity, Field also cited the Restatement for “contributory negligence [not being a] bar to recovery because fraudulent misrepresentation is an intentional tort ”. Field, 516 U.S. at 70, 116 S.Ct. 437 (emphasis added); see also Restatement (Second) of Torts § 545A. Field contrasted justifiable and reasonable reliance:
Although the plaintiffs reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.
516 U.S. at 70-71, 116 S.Ct. 437 (quoting Restatement (Second) of Torts § 545A cmt. b (emphasis added)).
In addition to the Restatement, Field cited other treatises to support the applicable standard being justifiable, not reasonable, reliance. Id. at 71-72, 116 S.Ct. 437. They state similarly that the recipient of a fraudulent misrepresentation may justifiably rely on it unless its falsity is obvious or there are “red flags” indicating such reliance is unwarranted. See id. (“[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own” (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971))); id. at 72 (recipient “is entitled to rely upon representations of fact of such a character as to require some kind of investigation or examination on his part to discover their falsity, and a defendant who has been guilty of conscious misrepresentation can not offer as a defense the plaintiffs failure to make the investigation or examination to verify the same” (quoting 1 F. Harper & F. James, Law of Torts § 7.12, pp. 581-83 (1956)) (emphasis added)); see also Mayer v. Spanel Int’l Ltd. (Matter of Mayer), 51 F.3d 670, 675 (7th Cir.) (“The common law of fraud ... does not have any reasonable-investigation requirement.” (emphasis added)), cert. denied, 516 U.S. 1008, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995).
(3)
Despite Field’s, guidance, reliance has been found unjustifiable by some courts if they conclude that, prior to card-issuance, the issuer’s creditworthiness investigation was inadequate.[34] For example, the above-quoted holding in Ellingsworth, relied on by the bankruptcy court in the case at hand, was that the issuer cannot justifiably rely on a card-use representation “if the card was pre-approved, and no direct financial information was obtained by the issuer ”. 212 B.R. at 338 (emphasis *419 added). The court was critical of card-issuance based on the debtor’s risk score, income, and employment, without the issuer’s also considering her assets, secured debt, and other living expenses. Id. at 339. Ellingsworth’s reasoning resembles the “assumption of risk” doctrine applied in Ward, 857 F.2d at 1085, a pre-Field case, which held: unless the issuer conducts a pre-issuance credit check, it assumes the risk that the debtor will not pay card-use loans.[35]
A different kind of “assumption of risk” doctrine was adopted by the Eleventh Circuit in First National Bank of Mobile v. Roddenberry, 701 F.2d 927, 932-33 (11th Cir.1983), decided under § 523(a)(2)(A)’s predecessor. A few years after applying for, and receiving, cards from a bank, the cardholder engaged in “a credit card spending spree”. Id. at 928. Although the bank advised merchants calling for authorization of charges to retrieve the card, she was able to use it without detection, by making small purchases, and continued doing so, even after filing bankruptcy. Id. at 928-29.
Roddenberry (pre-§ 523(a)(2)(A)) held: the issuer assumes the risk of nonpayment until it unconditionally revokes the right to card possession and use, and the cardholder is aware of the revocation. Id. at 932.[36] This theory has received considerable criticism.[37] Moreover, many bankruptcy courts in the very circuit that rendered the opinion have interpreted it as not precluding nondischargeability for “actual fraud” (added by the 1978 amendment), which most of those courts define as occurring through card-use without intent to pay.[38]
For several reasons, we reject both the Roddenberry and Ward variations of “assumption of risk”. (Interestingly, Mercer did not rely on it. In fact, at closing argument, her counsel stated he was not urging its adoption: “in all fairness it goes a little bit too far”.)
First, Roddenberry would make it virtually impossible for any issuer to prevail under § 523(a)(2)(A). The Bankruptcy Code should not be interpreted to require issuers to assume the risk that cardholders will commit fraud.[39] “Rather, *420 the credit card transaction (like any other lending relationship) is premised upon the notion that both parties will act in good faith. Thus, the debtor is expected to make ‘bona fide’ use of the card and not engage in fraud.” Chevy Chase Bank, FSB v. Briese (In re Briese), 196 B.R. 440, 449 (Bankr.W.D.Wis.1996) (emphasis added).[40]
Second, because the assumption of risk theory does not consider the debtor’s intent in incurring card-debt, it is likely to result in the discharge of debt fraudulently-incurred, contrary to the language and purpose of § 523(a)(2)(A).[41] See Grogan, 498 U.S. at 286-87, 111 S.Ct. 654 (Bankruptcy Code’s “fresh start” policy for benefit of “honest but unfortunate” debtors, not perpetrators of fraud); cf. Sovran Bank, N.A. v. Allen (In re Allen), 65 B.R. 752, 765 n. 20 (E.D.Va.1986) (“Judicial attempts to engraft a fresh start policy onto [§ 523(a)(2)(B), regarding false financial statements] ... are properly viewed with skepticism. Because the policies underlying questions of dischargeability are sharply conflicting, decisions about the scope of the nondischargeability provisions are best left to Congress where legislative techniques and the safeguard of political accountability can ensure that the conflicting policies are resolved in a legitimate manner.”).[42]
Moreover, such assumption of risk could have the unintended consequence of encouraging dishonest debtors, especially those with pre-approved cards, to undertake spending sprees, until they have reached their credit limits, knowing their debts will be discharged, as long as they wait at least 60 days before filing. See 11 U.S.C. § 523(a)(2)(C) (Supp.2000) (consumer debt for luxury goods or services, or cash advances aggregating more than $1,000, within 60 days before filing pre *421 sumptively nondischargeable).[43] Obviously, a dishonest but patient debtor who intends to incur card-debt in contemplation of discharge easily could avoid this 60-day period. See AT&T Universal Card Servs. Corp. v. Pakdaman, 210 B.R. 886, 889-90 (D.Mass.1997). Likewise, adoption of this theory undoubtedly would result in increased credit costs for honest card-users. See Citibank (S.D.), NA. v. Senty (In re Senty), 42 B.R. 456, 461 (Bankr.S.D.N.Y. 1984).
Finally, this assumption of risk theory is inconsistent with the common law, as expressed in the Restatement. Simply put, it confuses “assumption of risk” with “contributory negligence”, as those doctrines are commonly understood. Compare Restatement (Second) op ToRts § 463 (contributory negligence) with id. § 496A cmt. c (assumption of risk). Fraud being an intentional tort, a victim’s contributory negligence is not a defense.[44] See RestatemeNt (Second) of Torts § 545A & cmt. a. On the other hand, as discussed, the recipient of a fraudulent misrepresentation can be said, in a sense, to have assumed the risk of relying on the representation only when he knows it is false or it is obvious that reliance is unjustified. Accordingly, if an issuer does not know the falsity of the user’s representation of intent to pay, or if it is not obvious that reliance on the representation is unjustified, the issuer does not assume the risk the cardholder will commit fraud.
(4)
The Ninth Circuit’s justifiable reliance standard for card-dischargeability is consistent with Field and the Restatement: the “issuer justifiably relies on a representation of intent to pay as long as the account is not in default and any initial investigations into a credit report do not raise red flags that would make reliance unjustifiable”. Anastas, 94 F.3d at 1286 (emphasis added); see Eashai, 87 F.3d at 1090-91 (“although a person ordinarily has no duty to investigate the truth of a representation, a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth” (emphasis added)); Hashemi, 104 F.3d at 1126.[45] This standard appropriately “rec *422 ognizes the unique nature of credit card transactions, the ability of a cardholder to mask an actual financial condition by making minimum payments from whatever sources, and the ... issuer’s lack of access to the cardholder’s present financial condition” at each card-use. AT&T Universal Card Sews. Corp. v. Searle, 223 B.R. 384, 391 (D.Mass.1998) (for card-debt, adopting Ninth Circuit’s justifiable reliance standard).
Of course, if the issuer discovers “red flags” during a pre-issuance investigation or during the lending relationship, such as unemployment or insufficient income to service existing debt, it probably would not be justified in relying on a representation of intent to pay. See Briese, 196 B.R. at 454 (reliance unjustified where issuer’s investigation revealed “high debt load and an inability to make more than minimum payments”; issuer thus “ignored an obvious risk in extending credit”).[46]
Although the bankruptcy court cited Field and stated the applicable justifiable reliance standard, Mercer, 220 B.R. at 323, it did not apply it. Instead, it held: even assuming UCS actually relied on any representations by Mercer, it was not justifiable “in light of the incomplete nature of the credit information obtained by [UCS]”. Id. at 327. It suggested: “If [UCS] does not want its cardholders to use cash ad-vanees for gambling purposes and wants such uses to be non-dischargeable, why not put a specific restriction on this use in the cardholder agreement”. Id. at 328 (emphasis added).
At trial, the bankruptcy judge had suggested a number of questions UCS should have asked Mercer before card-issuance, such as whether she: was married; had other credit cards or loans; and had a gambling addiction. It had also asked why UCS did not prohibit card-use at ATM machines in casinos. At the trial’s conclusion, the court had suggested that, in addition to relying on credit bureau information and risk scores, issuers could ask, among other things, whether the debtor: has any problem with gambling; owes any gambling debts; and has had any gambling losses or winnings over the past several years. It had also suggested issuers should be required to exercise due diligence. Needless to say, the applicable justifiable reliance standard does not require such due diligence. In fact, the suggested standard was much more stringent than the reasonable reliance standard applied in many cases prior to being rejected by Field.[47]
Even assuming UCS, a sophisticated lender with considerable resources, *423 could have conducted the type investigation envisioned by the bankruptcy court, its failure to do so does not per se preclude finding it was justified in relying on Mercer’s card-use representations of intent to pay, because the information it obtained prior to card-issuance appears, based on the earlier-discussed evidence, not to have raised “red flags” requiring further investigation. Of course, justifiable reliance is a question of fact. See Coston v. Bank of Malvern (Matter of Coston), 991 F.2d 257, 260 (5th Cir.1993) (en banc) (pre-Field; reasonable reliance question of fact). Because the bankruptcy court applied an incorrect legal standard in finding no justifiable reliance, on remand it must make that determination, under the correct legal standard.
For justifiable reliance, the focus should be on whether UCS, based on its credit screening and its relationship with Mercer during her brief card-use, had reason to believe she would not carry out her representation, through card-use, of intent to pay. Relevant to that determination are the circumstances under which the representation was made, including the fact that it was made for the purpose of inducing UCS to act in reliance upon it, and the form and manner in which it was expressed. See Restatement (Second) of Torts § 544 cmt. a. And, facts pertinent to that inquiry include, but are not limited to: (1) UCS’ decision to offer the pre-approved card, based on an examination of Mercer’s credit history — twice before acceptance, and again between acceptance and issuance; (2) the terms of the card-agreement, which provided that Mercer’s card-use signified her acceptance of those terms, including the requirement that she pay the loans incurred, by making at least the minimum monthly payments; and (3) Mercer’s reaching her limit within the first billing cycle, within the scope of the card-agreement, and before UCS had any reason to suspect she would not pay.
(5)
Some courts have criticized issuers for allowing card-use at casinos, and have held issuers cannot justifiably rely on representations of intent to pay through card-use at a casino to obtain cash advances.[48] Along that line, Mercer contends that, because she so used her card, UCS failed to prove justifiable reliance.
Although there may be circumstances in which a debtor’s obtaining cash advances in a casino may have relevance in determining justifiable reliance, see, e.g., AT&T Universal Card Servs. v. Crutcher (In re Crutcher), 215 B.R. 696, 698 (Bankr. W.D.Tenn.1997), the record at hand does not contain evidence of such circumstances. It does not support Mercer’s assertion UCS was aware, when she inserted her card into the ATM, she was in a casino. Instead, the billing statement reflects that, although Mercer obtained four advances at a casino on 23 and 24 November, they were not posted until 27 November. As UCS’ representative testified, *424 that posting-date is when UCS receives an electronic transfer notification from the clearing bank, which may be several days after the transaction.
Moreover, as a matter of law, there is no basis for treating cash advances obtained at casinos differently from those obtained elsewhere. Section 523(a)(2)(A) does not do so. In any event, although Mercer testified she used her UCS cash advances for gambling, she obtained more than twice as many of them at a bank as in a casino. And, the evidence established UCS has no control over ATM locations and is not affiliated with the entity which operated the casino ATM from which Mercer obtained the advances.
The record contains no evidence to support precluding issuers from justifiably relying on a cardholder’s promise to pay a cash advance merely because it was obtained at a casino. Common sense suggests that not everyone does so to obtain gambling funds, much less that she does so because she is losing and has no other source for those funds. For example, if given a choice, some might consider it safer, or more convenient, to enter a casino to obtain cash, rather than do so at an ATM outside a bank, where there is no security and far greater potential for being robbed. Or, some might be in a casino hotel for a convention or musical entertainment and obtain a cash advance at an ATM there for non-gambling uses.
(6)
The fact that Mercer reached her limit within the first billing cycle, before receiving her first statement, also does not detract from finding justifiable reliance. Obviously, if a cardholder has a history of payments with the issuer, justifiable reliance will be easier to prove.[49] But, the absence of that history does not preclude such reliance.[50] Because Mercer reached her limit so quickly, UCS had no opportunity to evaluate her creditworthiness based on a history with it. Until 11 December (only a month after issuance), the last day of card-use, when she exceeded her $3,000 credit limit by approximately $186, Mercer’s card-use was within the terms of the card-agreement.
Requiring that a cardholder have a history of timely payments before the issuer can justifiably rely on the intent to pay representation would result in the discharge of all card-debt incurred within at least the first month of use. This would encourage dishonest debtors to reach their limits within the first billing cycle in order to preclude nondischargeability. It could also have the unintended consequence of *425 spurring issuers to establish such low initial limits that cards would serve no useful purpose to many cardholders.
(7)
Likewise, the fact that, 19 days after card-issuance, UCS flagged Mercer’s account for excessive transactions does not preclude justifiable rebanee. UCS’ representative testified: UCS reviewed the account, decided the transactions were not egregiously excessive, and cleared the account for further use; and, because the charges were within the terms of the card-agreement, UCS was obligated to honor it. Reliance on this factor could encourage issuers to cancel cards if used frequently within the first billing cycle, regardless of whether the limit had been exceeded.
5.
Finally, UCS was required to prove loss proximately caused by reliance on Mercer’s representations. See Restatement (SeCONd) of Torts § 548A (“fraudulent misrepresentation is a legal cause of a pecuniary loss resulting from .... reliance upon it if ... the loss might reasonably be expected to result from the rebanee”). On remand, if the bankruptcy court finds Mercer fraudulently misrepresented her intent to pay and UCS justifiably relied on that misrepresentation, then, as a matter of law, UCS’ loss (unpaid loan) resulted from the reliance. Id.[51]
III.
For Mercer’s § 523(a)(2)(A) nondis-chargeabbity vel non, we hold, as a matter of law, for each card-use: she represented her intent to pay the loan; if her representation was knowingly false, she intended to deceive UCS; it actually relied on the representation by authorizing the requested loan; and its loss was proximately caused by such rebanee. On remand, to be determined for each representation is whether: it was knowingly false; and UCS justifiably relied on it.
Accordingly, the judgment of the district court is REVERSED, and the case is REMANDED to the district court, with instructions to REMAND to the bankruptcy court for further proceedings consistent with this opinion.

REVERSED and REMANDED.

. In addition, if the debtor applied for a card, at issue may be 11 U.S.C. § 523(a)(2)(B) (excepting debts for, inter alia, credit extension obtained by materially false written statement respecting debtor's financial condition on which creditor reasonably relied).

. Compare, e.g., F.C.C. Nat'l Bank v. Reid (In re Reid), 237 B.R. 577, 583 (Bankr.W.D.N.Y. 1999) ("actual fraud” not limited to misrepresentation/reliance test; § 523(a)(2)(A)’s three bases are separate categories) with LA Capitol Fed. Credit Union v. Melancon (In re Melan-con), 223 B.R. 300, 307 & n. 4 (Bankr. M.D.La.1998) (same standard should apply).

. See, e.g., Household Credit Servs., Inc. v. Ettell (In re Ettell), 188 F.3d 1141, 1144 (9th Cir. 1999); Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 280-81 (6th Cir.), cert. denied, 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998); Universal Bank, N.A. v. Grause (In re Grause), 245 B.R. 95, 99 (8th Cir.BAP 2000).

. See, e.g., First Nat’l Bank of Mobile v. Roddenberry, 701 F.2d 927, 930 n. 3 (11th Cir. 1983) (citing Zaretsky, The Fraud Exception to Discharge Under the New Bankruptcy Code, 53 Am. Bankr.L.J. 253, 257 (1979)); Reid, 237 B.R. at 586.

. See, e.g., Melancon, 223 B.R. at 312-15 (Davison-Paxon obsolete due to addition of actual fraud and Field's adoption of common-law interpretation); AT&T Universal Card Servs. v. Samani (In re Samani), 192 B.R. 877, 879-80 (Bankr.S.D.Tex.1996) (allowing creditor to establish fraud based on card-use representation of intent and ability to pay would directly contravene Davison-Paxon); Louisiana Nat’l Bank of Baton Rouge v. Talbot (In re Talbot), 16 B.R. 50, 54 (Bankr.M.D.La.1981) (bound by Davison-Paxon); Ranier Bank v. Poteet (In re Poteet), 12 B.R. 565, 568 (Bankr.N.D.Tex. 1981) (Davison-Paxon not relevant to card-use).

. See, e.g., First Card Servs., Inc. v. Flynn (In re Flynn), 184 B.R. 8, 9 (Bankr.E.D.N.Y. 1995); Citibank (S.D.), N.A. v. Rodriguez (In re Rodriguez), 138 B.R. 112, 114 (Bankr.S.D.Fla. 1992); Poteet, 12 B.R. at 567.

. See, e.g., Sears, Roebuck & Co. v. Hernandez (In re Hernandez), 208 B.R. 872, 880 (Bankr. W.D.Tex.1997); Chase Manhattan Bank, N.A. v. Ford (Matter of Ford), 186 B.R. 312, 317 (Bankr.N.D.Ga.1995).

. See, e.g., Chase Manhattan Bank (U.S.A.) N.A. v. Carpenter (Matter of Carpenter), 53 B.R. 724, 728 (Bankr.N.D.Ga.1985).

. See, e.g., Rembert, 141 F.3d at 281; Anas-tas v. American Sav. Bank (In re Anastas), 94 F.3d 1280, 1285 (9th Cir.1996); Citibank (S.D.), N.A. v. Senty (In re Senty), 42 B.R. 456, 459 (Bankr.S.D.N.Y.1984).

. See, e.g., Rembert, 141 F.3d at 281; Anas-tas, 94 F.3d at 1285.

. See Chevy Chase Bank, FSB v. Briese (In re Briese), 196 B.R. 440, 450 & n. 16 (Bankr. W.D.Wis.1996).

. See also, e.g., Universal Bank, N.A. v. Rich (In re Rich), 249 B.R. 709, 715-16 (Bankr. N.D.Tex.2000) (citing Alvi); cf. FCC Nat’l Bank v. Etto (In re Etto), 210 B.R. 734, 739-40 (Bankr.N.D.Ohio 1997) (where card pre-approved and issued without credit check, card-use not promise to pay).

. Judge Duhé’s discussion of Williams overlooks the most fundamental distinction between card-use and payment by check: as discussed above, card-use is a loan-request against a line of credit, an inherent part of which is a promise to repay; a check is neither a loan-request nor a promise to repay.

. See also, e.g., Manufacturer's Hanover Trust Co. v. Ward (In re Ward), 857 F.2d 1082, 1086-87 (6th Cir.1988) (Merritt, J., dissenting) (card relationship is issuer’s offer for series of unilateral contracts formed with each card-use (citing Restatement (Second) of Contracts § 31)); AT&T Universal Card Servs. Corp. v. Searle, 223 B.R. 384, 389 (D.Mass. 1998) (Anastas unilateral contract approach consistent with words or conduct forming representation, with it inherent in transaction); cf. Goldman v. First Nat’l Bank of Chicago, 532 F.2d 10, 18 & n. 13 (7th Cir.) (under Consumer Credit Protection Act, no extension of credit until card-use), cert. denied, 429 U.S. 870, 97 S.Ct. 183, 50 L.Ed.2d 150 (1976). But see Feld, 203 B.R. at 366-67 (card-use does not create separate contract; instead, it is anticipated performance of contract created at card-issuance, similar to draw on line of credit; instead of new representation with each card-use, representation of intent to pay continues while card used).

. See also Feld, 203 B.R. at 367 (representation of intent to pay transmitted to issuer even though not party to transaction; because at some point issuer must be notified transaction occurred, it will receive any accompanying representation; therefore, issuer’s failure to acquire contemporaneous knowledge of debt- or’s affirmation of intent to pay not fatal); Briese, 196 B.R. at 450 (although debtor, through card-use, may not speak directly to issuer, "debtor makes a representation— namely, the promise to pay for the credit advanced").

. Holding card-use is a representation of intent to pay is not a "fiction”, as Judge Duhé asserts, but is, instead, consistent with the Restatement’s above-discussed position that a representation can be made through conduct. See Restatement (Second) of Torts § 525 cmt. b. In so holding, we do not ignore the principle that exceptions to discharge are narrowly construed. That principle seeks to further the goal of providing the debtor a "fresh start”. See Miller v. J.D. Abrams Inc. (Matter of Miller), 156 F.3d 598, 602 (5th Cir.1998), cert, denied, 526 U.S. 1016, 119 S.Ct. 1249, 143 L.Ed.2d 347 (1999). By enacting § 523(a)(2)(A), Congress made clear its intent to limit the "fresh start” to honest, but unfortunate, debtors, not perpetrators of fraud. See, e.g., Grogan, 498 U.S. at 286-87, 111 S.Ct. 654. Accepting Judge Duhé’s view that card-use includes no representation of intent to pay would undermine this equally important principle of bankruptcy law.

. See, e.g., American Express Travel Related Servs. Co., Inc. v. Christensen (In re Christensen), 193 B.R. 863, 866 (N.D.Ill.1996) (multi-factor "objective” test inconsistent with common-law “subjective” standard); Alvi, 191 B.R. at 733 (factors do not address critical subjective intent).

. See also, e.g., Chase Manhattan Bank v. Murphy (In re Murphy), 190 B.R. 327, 332 n. 6 (Bankr.N.D.Ill.1995) (intent to pay not synonymous with ability to pay; “[a]lone, financial inability to repay does not establish fraudulent intent”).

. See, e.g., Ettell, 188 F.3d at 1145; Rembert, 141 F.3d at 282; Hashemi, 104 F.3d at 1125; Eashai, 87 F.3d at 1090. Cf. Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 668, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) ("a plaintiff is entitled to prove the defendant’s state of mind through circumstantial evidence”).

. See, e.g., Rembert, 141 F.3d al 279, 282 (debtor “believed” and "thought” would win enough to pay card-debt; subjective intent to pay present where debtor took second mortgage on home, used proceeds to pay debt, and made substantial payments on it while continuing to gamble and lose); Anastas, 94 F.3d at 1287 (although unlikely debtor would win in order to pay cash advances that financed gambling, record supported good faith intent, where debt incurred over six-month period during which monthly payments made, issuer contacted to try to make alternative payment arrangements, and debtor testified always intended to pay, but gambling addiction led to unexpected financial circumstances); Star Bank, N.A. v. Stearns (In re Stearns), 241 B.R. 611, 624 (Bankr.D.Minn.1999) (debtor’s persistent belief in salvation of "big win” was fatuous, but genuine); Universal Card Servs. v. Pickett (In re Pickett), 234 B.R. 748, 757 (Bankr.W.D.Mo.1999) (intent to pay not credible when debtor lost $100,000 in one year); Boyd Gaming Corp. v. Hall (In re Hall), 228 B.R. 483, 490 (Bankr.M.D.Ga.1998) (intent to pay where debtor honestly, though unreasonably, believed would get lucky and be able to pay debts, although had lost for over 15 years).

. See also, e.g., Sears, Roebuck & Co. v. Homschek (In re Homschek), 216 B.R. 748, 753 (Bankr.M.D.Pa.1998) (card-use "for the sole purpose of obtaining" loan); Feld, 203 B.R. at 372 (by card-use, debtor intended to induce issuer to extend credit — "requisite intent to induce action”).

. Judge Dennis states that, when read in context, this quoted testimony did not refer to reliance on Mercer’s card-use, but instead concerned the quality of information available to UCS at card-issuance. But, the specific question at issue specifically refers to "extending] credit” and to "for these charges " (emphasis added), obviously referring to card-use, not card-issuance. The fact that much of the testimony preceding and subsequent to the quoted testimony dealt with card-issuance simply reflects the focus of the parties — and the bankruptcy court — on justifiable, not actual, reliance.
As Judge Dennis points out, prior to the quoted testimony, UCS' witness testified regarding Mercer’s other credit cards and the credit bureau screening process. Immediately after the quoted question and answer, counsel asked another question regarding UCS’ card-issuance decision. And, the very next question concerned whether Mercer "had the intent and ability to repay these charges when they were incurred ", (Emphasis added). Viewing UCS’ witness’ testimony as a whole, it seems clear that UCS' counsel was trying to present evidence to establish each of the elements of fraud, but focused primarily on the most heavily-disputed elements of scienter and justifiable reliance. The presentation of UCS’ witness’ testimony was somewhat disjointed, in part due to the bankruptcy court's intermittent questions regarding UCS’ pre-issuance investigation.
In short, UCS' witness testified that UCS would ”no[t]” "have extended credit” to Mercer "if it knew that she would not pay for [the] charges on [her] account”. This is actual reliance.

. Judge Dennis focuses, as did the bankruptcy and district courts, on UCS' reliance on its own screening and investigation in making the decision to issue the card to Mercer. Because the representations at issue are those of intent to pay each loan obtained through card-use, the fact that UCS did not rely on any representation by Mercer at card-issuance does not preclude it, as discussed infra, from relying on card-use representations. See Restatement (Second) of Torts § 546 (representation need not be sole, but only substantial, factor in influencing recipient’s action). As discussed, because the bankruptcy and district courts applied an incorrect legal standard in finding no actual reliance, focusing on card-issuance rather than card-use, to find no actual reliance, the clearly erroneous stan *413 dard is not applicable. Judge Dennis' suggestion that the error is harmless because UCS did not prove actual reliance on Mercer’s card-use representations is based on his view of UCS’ witness' testimony as relating to the information UCS obtained through its pre-card-issuance investigation; as discussed supra, the question asked of the witness referred to "these charges”, not to card-issuance. Moreover, the error was not harmless. By focusing solely on UCS' card-issuance decision, and what the bankruptcy court found to be an inadequate pre-issuance investigation of Mercer’s creditworthiness under a standard even more stringent than the now-rejected reasonable reliance standard, the bankruptcy court did not consider: whether, with each card-use, Mercer made a representation of intent to pay; or whether UCS relied on that representation when approving charges or advancing cash to Mercer.

. See, e.g., Mayer v. Spanel Int’l Ltd. (Matter of Mayer), 51 F.3d 670, 676 (7th Cir.), cert. denied, 516 U.S. 1008, 116 S.Ct. 563, 133 L.Ed.2d 488 (1995); Novartis Corp. v. Luppino (In re Luppino), 221 B.R. 693, 701 (Bankr. S.D.N.Y.1998); Hernandez, 208 B.R. at 876.

. See, e.g., Melancon, 223 B.R. at 327; AT&T Universal Card Servs. Corp. v. Pakdaman, 210 B.R. 886, 890 (D.Mass.1997); see also Ward, 857 F.2d at 1087 (Merritt, J., dissenting) (issuer relied on good faith card-use because it paid debt created thereby with expectation of reimbursement by cardholder); AT&T Universal Card Servs. Corp. v. Dietzel (In re Dietzel), 245 B.R. 747, 755 (Bankr.D.Mass.2000) (because card-use represents intent to pay, cardholder induces action by issuer; thus, cardholder's false representation is substantial factor in issuer’s decision to make loan); Citi-corp Credit Servs., Inc. v. Hinman (In re Hinman), 120 B.R. 1018, 1022 (Bankr.D.N.D. 1990) (card industry functions upon issuer's guarantee of payment to merchant; reliance by issuer inherent in system because card-use forces issuer to honor its guarantee to merchant).

. Judge Dennis' quotation of testimony dealing with scienter is not relevant to the analysis for actual reliance. Nevertheless, Judge Dennis relies on that testimony to assert "[i]t is highly improbable that [UCS] actually relied on these same card uses — which its expert testified were indicative of a fraudulent intent not to repay the charges incurred — in deciding to take the action of extending credit to Mercer”. (Emphasis added.) Obviously, a finding of no actual reliance cannot be based on evidence that the creditor, in hindsight, determines is indicative of the debtor’s fraudulent intent.

. See also Hernandez, 208 B.R. at 877; Bank One Columbus, N.A. v. McDaniel (In re McDaniel), 202 B.R. 74, 78 (Bankr.N.D.Tex. 1996); Christensen, 193 B.R. at 867; cf. Bank of America v. Jarczyk (In re Jarczyk), 253 B.R. 140, 149 (Bankr.W.D.N.Y.2000) (if card issued without relying on debtor's representation of intent to pay, may not claim reliance on card-use representations); Briese, 196 B.R. at 454 (issuer relied on own investigation; debtors' representations largely irrelevant); Pan American Bank, N.A. v. Lilienfeld (In re Lilienfeld), 36 B.R. 724, 726-27 (Bankr. S.D.Fla.1984) (issuer relies on debtor’s representations at card-issuance and need not prove specific reliance at each card-use).

. See also Rich, 249 B.R. at 719; Universal Bank, N.A. v. Kuntz (In re Kuntz), 249 B.R. 699, 707 (Bankr.N.D.Tex.2000); Hernandez, 208 B.R. at 878.

. Judge Dennis states that, because each cash advance Mercer obtained was made instantaneously from an ATM machine, no one at UCS evaluated the transaction or relied on any representation Mercer made through card-use. Relying on the evidence of the time lag between transactions (when the loan/cash advance was made/received) and posting the charges, Judge Dennis concludes that, because UCS was not aware of the transactions until several days after they occurred, UCS could not have relied contemporaneously upon each individual draw on Mercer's credit line. As discussed, this analysis completely overlooks the fundamental fact that a cash advance is a loan, not a gift. Inherent in any loan is a promise to pay. See Melancon, 223 B.R. at 326 (“promise to repay is not merely a substantial factor in determining whether a loan will be made[;][i]t is an essential element of any loan”).

. Along this line, in some circumstances the claimed reliance on a representation of intent to pay may be so unreasonable that it could support finding no actual reliance. "[T]he greater the distance between the reliance claimed and the limits of the reasonable, the greater the doubt about reliance in fact”. Field, 516 U.S. at 76, 116 S.Ct. 437; see also Vann, 67 F.3d at 281 ("Reasonableness of the reliance may be used as proof that the creditor did rely.”); cf. First Deposit Nat'l Bank v. Mack (In re Mack), 216 B.R. 981, 983, 985 (Bankr.N.D.Fla.1997) (without conducting any credit check, issuer sent debtor solicitation, requesting only her social security number, home telephone number, and annual household income; card provided debtor along with cash advance check for $3,000)] AT&T Universal Card Servs. v. Crutcher (In re Crutcher), 215 B.R. 696, 698 (Bankr. W.D.Tenn.1997) (after debtor advised issuer she was considering bankruptcy and was an addicted gambler, and requested her account be closed and not reopened under any circumstances, issuer approved emergency cash advance so debtor could pay $2,500 casino debt and permitted cash advances, increasing account balance to over $11,000 during 24-hour gambling spree); First USA Bank v. Hunter (In re Hunter), 210 B.R. 212, 213-14 (Bankr.M.D.Fla.1997) (after debtor defaulted on card and filed bankruptcy, same creditor offered debtor another pre-approved card one week before trial on creditor’s nondischarge-ability complaint); Feld, 203 B.R. at 370 (if issuer distributes cards freely without conducting any credit analysis, appropriate to find no reliance).
Concerning Field's statement that "reasonableness goes to the probability of actual reliance”, 516 U.S. at 76, 116 S.Ct. 437, it would seem that any situation in which claimed actual reliance is so unreasonable as to support finding no reliance-in-fact would also support finding reliance was not justifiable, as discussed infra. We need not reach that issue here.

.Judge Dennis states: "After Mercer accepted the credit card and began using it, [UCS] did not take any action to extend her line of credit in contemporaneous reliance on each draw”. But, obviously, by making the loan (cash advance) requested with each card-use, UCS took action in reliance on Mercer’s promise to repay that loan.
*416 The transactions took place within the context of the cardmember agreement and line of credit.
On a purely physical level, the course of action that causes the issuer's loss is the pushing of buttons, combined with the internal actions of the ATM. But these physical actions must be understood within the context of the contractual arrangement that makes them meaningful. Pushing random buttons or putting the wrong card in the machine won’t generate any money. It is only through prior arrangements (the assignment of a card to the holder, the choice of a PIN, the operation of the network, the provision of ATMs in convenient locations) that the transaction works at all, and part of this prior arrangement is the understanding that the physical act of pushing the buttons will carry with it some unverbalized statements that have legal significance.
Melancon, 223 B.R. at 326 (emphasis added).
When Mercer received the requested cash advances, she immediately received cash in hand. The fact that the transactions (cash advances) were not posted simultaneously does not change the fact that they were loans which would not have been made in the absence of a promise to repay them. Judge Dennis’ position would require card issuers to monitor individual transactions as they occur, and would result in great delay in receiving credit (especially troublesome for cash advances), increased credit costs for non-bankrupt card users, and would, in short, greatly undermine — if not destroy — the use of cards as a medium of exchange.

. Cf. Mayer, 51 F.3d at 676 (''[A]n investor cannot close his eyes to a known risk. If the investor possesses information sufficient to call the representation into question, he cannot claim later that he relied on or was deceived by the lie. This is not because he has a duty to investigate lies or prevent intentional torts, though; it is, rather, because the false statement is not material under the circumstances.” (emphasis added)).

. See, e.g., Universal Card Servs. Corp. v. Akins (In re Akins), 235 B.R. 866, 872-74 (Bankr.W.D.Tex.1999) (applying "commercial entrapment” theory, card-debt dischargeable because credit extension was result of issuer’s negligent lending practices and industry’s negligent use of faulty risk score system); Bank One Columbus, N.A. v. Schad (In re Kountry Korner Store), 221 B.R. 265, 274 (Bankr.N.D.Okla.1998) ("unlikely that ... issuer will be able to prove justifiable reliance if it did nothing to protect itself from irresponsible credit card use other than reviewing third-party credit reports which [are] ... so superficial in scope as to make them unreliable predictors of solvency, income, budget, work history, and other data relevant to the creditworthiness of a customer”); McDaniel, 202 B.R. at 78 ("creditor cannot sit back and do nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation” (emphasis added)).

. See also Etto, 210 B.R. at 739; Carpenter, 53 B.R. at 728-29.

. See also FCC Nat’l Bank v. Gilmore (In re Gilmore), 221 B.R. 864, 873 n. 10 (Bankr. N.D.Ala.1998) (suggesting Roddenberry assumption of risk doctrine “simply a variation of the common law principles of consent and estoppel, which may preclude a recovery for fraud”, irrespective of justifiable reliance); Dominion Bankshares Servs. v. Shrader (In re Shrader), 55 B.R. 608, 612 (Bankr.W.D.Va. 1985) (Roddenberry sound because burden properly placed on issuer to effectively monitor accounts); cf. First Nat’l Bank of Atlanta v. Robinson (Matter of Robinson), 55 B.R. 839, 847-48 (Bankr.S.D.Ind.1985) (issuer assumed risk of nonpayment to extent of charges up to credit limit when mailed unsolicited, pre-ap-proved application without inquiring as to financial condition or ability to pay).

. See, e.g., Ford, 186 B.R. at 318 n. 8 ("many courts have criticized [Roddenberry’s] approach as going to an extreme, tipping the scales so far in favor of debtors that very few credit card debts will qualify as nondischargeable”); Cox, 182 B.R. at 634 (theory "too judgmental to support a court decision purporting to apply a statute”); Sears Roebuck & Co. v. Faulk (In re Faulk), 69 B.R. 743, 755-56 (Bankr.N.D.Ind.1986) (Roddenberry automatic revocation rule rejected "as contrary to the clear language of § 523(a)(2)(A)”).

. See, e.g., AT&T Universal Card Servs. Coip. v. Reach (In re Reach), 225 B.R. 236, 239 (Bankr.N.D.Ala.1997); Hunter, 210 B.R. at 215; American Express Travel Related Servs. Co., Inc. v. lohnson (Matter of Johnson), 141 B.R. 473, 478 (Bankr.M.D.Ga.1992).

. See, e.g., Feld, 203 B.R. at 366 n. 6 (fact that creditors anticipate loss does not mean “they should be saddled with losses resulting from fraud”); Briese, 196 B.R. at 449 (creditor does not assume risk debtor is dishonest); *420 J.C. Penney Co., Inc. v. Shanahan (In re Shanahan), 151 B.R. 44, 47 (Bankr.W.D.N.Y.1993) (issuer "perhaps assumes the risk of the user's ignorance, mistake, naivete, gullibility, misfortune, accident, or other innocent failing or adversity, but [not of) user’s knowing and intentional use of the card to obtain goods without any realistic prospect of having the wherewithal to pay”).

. See also Sanford Inst, for Sav. v. Gallo, 156 F.3d 71, 75 (1st Cir.1998) (rule that "party may justifiably rely on a misrepresentation even when he could have ascertained its falsity by conducting an investigation ... is at the heart of millions of commercial transactions conducted daily in this nation which rely on the honesty and truthfulness of representation made by the parties” (citations omitted)).

. See Searle, 223 B.R. at 389 (" ‘assumption of risk’ theory advantages the dishonest and deceptive debtor”); Briese, 196 B.R. at 449 ("[w]hile the bankruptcy code is to be construed liberally in favor of the debtor, it is also to be fair to creditors”; assumption of risk theory is "unsatisfactory, primarily because dishonest debtors may manipulate its mechanical distinction between debts incurred before and after credit privileges are revoked”); Hecht's v. Valdes (In re Valdes), 188 B.R. 533, 536-37 (Bankr.D.Md.1995) (theory allows discharge regardless of debt- or's intent, leaving issuer with little or no recourse even in most egregious situations; focus should be not on issuer’s improvidence, but "on a fundamental tenet of bankruptcy— the discharge and fresh start are intended for the honest, but unfortunate debtor”); Dough-erty, 84 B.R. at 657 (theory "improperly focuses on the conduct of the 'improvident creditor' rather than on the conduct of the deceitful debtor who may be trying to misuse the Bankruptcy Code”).

.See also, e.g., Mayer, 51 F.3d at 674 ("Congress concluded that preventing fraud is more important than letting defrauders start over with a clean slate, and we must respect that judgment.”); American Express Travel Related Servs. Co., Inc. v. Diaz (In re Diaz), 185 B.R. 867, 870 (Bankr.M.D.Fla. 1994) ("By creating the fraud exceptions to discharge, Congress sought to discourage fraudulent conduct and ensure that relief intended for honest debtors does not inure to the benefit of dishonest ones.” (emphasis added)).

. Accordingly, we disagree with the bankruptcy court's holding in Cox, 182 B.R. at 635-36, that § 523(a)(2)(C) is the "exclusive remedy” against "loading up” (incurring card debt in contemplation of bankruptcy); see also AT&T Universal Bank v. Hensley (In re Hensley), 201 B.R. 494, 498 (Bankr.S.D.Ohio 1996). That portion of Cox was disapproved by the district court in Pakdaman, 210 B.R. at 889-90.

. See also, e.g., Gallo, 156 F.3d at 74 (“equities weigh in favor of giving the benefit of the doubt to the victim, careless as it may have been, and even though it could have been more diligent and conducted an investigation”); Mayer, 51 F.3d at 675 ("[I]t is precisely because fraud has a mental-state requirement that it lacks a reasonable-investigation requirement.. .. Tolerating fraud by excusing deceit when the victim is too easily gulled increases both the volume of fraud and expenditures on self-defense. Society is better off with less fraud and fewer precautions against it, and the common law has tailored the doctrine accordingly.”).

.See also, e.g., Dietzel, 245 B.R. at 754 (applying Anastas standard); AT&T v. Herrig (In re Herrig), 217 B.R. 891, 899-900 (Bankr. N.D.Okla.1998) (same); MBNA America v. Si-mos (In re Simos), 209 B.R. 188, 193 (Bankr. M.D.N.C.1997) (same); Feld, 203 B.R. at 370 ("In rejecting those cases that impose a duty to investigate in the absence of anything that would arouse suspicion, the Supreme Court implicitly accepts as justifiable the extension of credit where the card use does not send up any red flags. Thus, following an initial credit check that uncovers no problems, if a cardholder's use is consistent with past use, and the cardholder is paying the minimum charge and staying within credit limits, reliance on the cardholder's implied representation of intent to repay will generally be justifiable.” (emphasis added)).

. See also, e.g., Mercantile Bank v. Canovas, 237 B.R. 423, 429-30 (Bankr.N.D.Ill.1998) (issuer did not justifiably rely on representations of intent to pay made after it terminated debtor’s charging privileges and then invited him to incur more charges; falsity of misrepresentation was obvious upon cursory examination ); AT&T Universal Card Servs., Inc. v. Nguyen (In re Nguyen), 235 B.R. 76, 90-91 (Bankr.N.D.Cal.1999) (reliance unjustifiable where card issued with $8,000 limit, knowing debtor would have $32,400 in available credit on his four cards, even though his monthly income was only $640).

. See BancBoston Mortgage Corp. v. Ledford (In re Ledford), 127 B.R. 175, 178 (M.D.Tenn. 1991) ("critical issue is whether reliance on the representations was reasonable, not whether the decision to loan money was reasonable” (emphasis added)), aff'd, 970 F.2d 1556 (6th Cir.1992), cert. denied, 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993); Faulk, 69 B.R. at 749 (more stringent reasonable reliance standard does not authorize court to "second guess a creditor's decisions to make a loan or set loan policy for a creditor” or "to undertake a subjective evaluation and judgment of a creditor’s lending policies and practices” (internal quotation marks and citations omitted)).

. See, e.g., Melancon, 223 B.R. at 329 & nn. 42, 43 (noting "obvious stupidity of ... decision to lend money in a casino to borrowers who gamble”; "[i]f a lender allows a holder to borrow money inside a casino, then the lender must be charged with two bits of information: the money will be used for gambling, and either the borrower has been losing or he has no money of his own with which to gamble”; "[a] creditor that lends money inside a casino is not justifiably relying on anything” (emphasis added)); AT&T Universal Card Servs. Corp. v. Reynolds (In re Reynolds), 221 B.R. 828, 840 (Bankr.N.D.Ala.1998) ("issuers which allow cash advances on ATMs in gambling casinos are on notice their customers may use the money to gamble, and presumably that some gamblers may be poor credit risks”).

. See, e.g., Hashemi, 104 F.3d at 1126 (justifiable reliance where account not in default and debtor had history of paying large balances); AT&T Universal Card Servs. v. Fronning (Matter of Fronning), 222 B.R. 614, 618 (Bankr.D.Neb.1998) (justifiable reliance where cards had been outstanding for over a year when disputed charges made, charges were within limit, and no evidence to suggest issuer on notice of debtor’s deteriorating financial condition before charges made); Samara, 192 B.R. at 880 (justifiable reliance "based on debtors' prior sporadic payment of at least the minimum monthly amount due”); cf. AT&T Universal Card Servs. v. Burdge (In re Burdge), 198 B.R. 773, 778 (9th Cir. BAP 1996) (issuer's failure to investigate prior to increasing limit does not make reliance unjustifiable because debtor had history of responsible card use and issuer not aware of any red flags).

. See Pickett, 234 B.R. at 758-59 (justifiable reliance where debtor immediately obtained cash advances and filed bankruptcy before bimonthly review could be made, issuer used appropriate screening practices, and received no warning of fraud or other irregularities in time to take action to prevent fraud; obtaining cash advances within limit was not warning issuer being deceived and should commence investigation).

. See, e.g., Dietzel, 245 B.R. at 755 (proof of damage readily established when debtor does not pay card-debt); Sears, Roebuck & Co. v. McVicker (In re McVicker), 234 B.R. 732, 740 (Banlcr.E.D.Ark. 1999) (issuer suffered loss equal to unpaid charges, proximately caused by having justifiably relied on debtor’s misrepresentation) .